IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TAMARA BRAND and THEO
BRAND,

    Plaintiffs,

    v.

KEVIN CASAL and TERESA
PARDINAS,

    Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
1:13-CV-0322-AT

## ORDER

This Order addresses the second of two summary judgment motions filed by the parties to this case. The first, Plaintiffs' Motion for Partial Summary Judgment, was denied on September 28th, 2015. In that Order, the Court noted that "[t]he record in this case includes a hot mess of factual disputes that undoubtedly will affect the Court's consideration of Defendants' motion for summary judgment as well." (Doc. 86 at 33.) The Court now considers Defendants' Motion for Summary Judgment *in toto* [Doc. 60]. For the following reasons, it is **GRANTED IN PART** and **DENIED IN PART**.

## I.   LEGAL STANDARD

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in

favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party.  *Id.* at 249.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Where the moving party does not bear the burden of proof at trial, as here, the "moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim [but] simply may . . . point[ ] out to the district court [ ] that there is an absence of evidence to support the non-moving party's case."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  Alternatively, if the moving party "put[s] on evidence affirmatively negating the material fact" required for the non-movant to prove its case, "then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."  *Id.* at 1116.

The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  In deciding this essential question, the Court may not weigh conflicting evidence or

make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993), *reh'g denied*, 16 F.3d 1233 (11th Cir. 1994) (en banc). Rather, Plaintiffs' testimony and other evidence is treated as true for purposes of review of Defendants' pending Motion for Summary Judgment. *See Reeves*, 530 U.S. at 150 (when reviewing the record evidence at the summary judgment stage, "the court must draw all reasonable inferences in favor of the nonmoving party").

## II.   BACKGROUND FACTS

The Court notes that for purposes of their summary judgment motion, Defendants have to some extent relied on Plaintiffs' testimony, rather than Defendants' own contrary testimony, and largely present Plaintiffs' version of the facts as material for the Court's consideration.  Consequently, Plaintiffs admit to these facts and they are undisputed.  The Court further notes that in addition to their depositions, many of the parties also testified at the underlying state court criminal trial of Tamara Brand (who was acquitted of the charges for which she was arrested following the incident that is the subject of this suit).  Thus, the record is complicated as a result of the parties' reliance on these various, and sometimes conflicting, sources of testimony.

Unless otherwise noted, the following facts are undisputed and presented in the light most favorable to Plaintiffs as the non-movants.

### A.   Facts leading up to initial encounter

On November 4, 2010, a Gwinnett County Magistrate Judge issued a warrant for Wesley Brand's arrest for the crime of theft by taking of a motor

vehicle, a felony. (Deposition of Deputy Kevin Casal Ex. 3, Arrest Warrant, Doc. 47 at 30.) The warrant was sworn out by the Gwinnett County Police Department, which is not a party to this case. (Casal Dep. at 21:2-3.) Four months later, Defendant Deputy Kevin Casal, of the Gwinnett County Sheriff's Department, was tasked with serving that warrant. (*Id*. at 20:17-21:8.)

According to the arrest warrant, Wesley Brand was a 27-year-old white male.[1] (*Id*. at 17; Doc. 47 at 30.) The warrant indicated Wesley's address was unknown, (*id*.), so Deputy Casal investigated and found an address for him on a Gwinnett County Jail Booking Sheet ("Booking Sheet") from October 14, 2010, less than one month before the warrant had been sworn out. (Doc. 47 at 31.) The Booking Sheet listed 4179 Valley Brook Road, Snellville, Georgia as Wesley's address, and also listed Wesley as a black male.

Once Deputy Casal found that address, he did no further investigation to determine the location of Wesley Brand's residence prior to going out to effect the arrest. (*Id*. at 20.) At approximately 11:00 PM on Monday, February 7, 2011,

---

[1] At the time of the incident in 2011, Wesley was 17 years old, of mixed race, and had begun living as a female. Plaintiffs have requested that the Court use its inherent power to strike certain sentences on pages 2 and 13 of Defendants' Motion for Summary Judgment as immaterial and impertinent. (*See* Doc. 69, Pls' Resp. to MSJ at 1, n.1, referring to Defendants' brief, (Doc. 60 at 2-3, 13).) The Court agrees that the sort of *ad hominem* name-calling has no place in a courtroom or in documents publicly filed and expects a higher degree of professionalism of counsel practicing in this Court. Accordingly, the Clerk is **DIRECTED** to restrict access to Defendants' motion at Doc. 60 to case participants only. Defendants are **DIRECTED** to file an amended version of their motion either omitting or redacting this referenced information (the last sentence on page 2, continuing onto page 3, and the last sentence of the middle paragraph on page 13) **WITHIN FIVE DAYS** of the entry of this Order. The Court further notes that in reviewing the record in this case, the parties have neglected to redact certain sensitive personal information, including social security numbers, from several documents filed in connection with their briefs in violation of the Court's Standing Order. The parties are **DIRECTED** to confer and jointly move to seal these documents and refile them in a redacted form **WITHIN FOURTEEN DAYS** of the entry of this Order.

Deputy Casal and his partner, Deputy Teresa Pardinas, arrived at 4179 Valley Brook Road to serve the warrant.   (Casal Dep. at 51:12-13; Casal Incident Report.[2])  At the time they arrived, Deputy Casal did not "know" that Wesley lived there.  (Casal Dep. at 19:7-10.)  Rather, Deputy Casal considered it a "third-party warrant," meaning that it was for the arrest of the suspect at a third-party's home.  (*Id.* at 21:22-23:21.)

Before service was attempted, Deputy Pardinas went around to the back of the house, while Deputy Casal stayed at the front.[3] (Declaration of Teresa Pardinas ¶ 6, Doc. 44-2; Casal Incident Report.) (*Id.*)  There was a car in the driveway, so Deputy Casal radioed his dispatcher and had her run the license plate number.  (Dispatcher Audio Tape[4] at 1:30.)  The license plate returned to Theotis Brand.  (Dispatcher Audio Tape at 2:30.)

At the front door, Deputy Casal encountered Ms. Jayne Velazco, who had gone out onto the front porch to smoke a cigarette.  (Casal Incident Report; Deposition of Ms. Jayne Velazco at 16:23-17:17, Doc. 49.)  The front porch, where much of the action in this case took place, is elevated and has a small railing, as shown in the photographs below:

---

[2] In this Order as in the last, the Incident Report is properly before the Court on summary judgment because it "could be reduced to admissible evidence at trial" for the facts the Court recognizes that it supports in this Order.  *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).  Deputy Casal authenticated the report in his deposition, (Casal Dep. at 8), and he has testified consistently with the Incident Report.

[3] There is some dispute over why Deputy Pardinas went to the back of the house.  According to Deputy Pardinas, she went around back as a matter of protocol "to prevent escape of the warrant suspect."  (Pardinas Decl. ¶ 6.)  According to Deputy Casal, she did so "to see if the wanted subject could be located inside the house."  (Casal Incident Report.)

[4] In the Court's prior Order, it granted Defendants' motion to supplement the summary judgment record with the Dispatcher Audio Tape.  (*See* Doc. 86 at 5 n.4.)

 

(Defs.' SMF ¶ 22; Pls.' Resp. SMF ¶ 22; Declaration of Teresa Pardinas Ex. A at 5,

Doc. 44-2 at 9 (left photograph); Deposition of Mrs. Tamara Brand Ex. 2 at 10,

Doc. 50-1 at 13 (right photograph).)

Deputy Casal approached Ms. Velazco and asked if Wesley was there.

(Velazco Trial Tr. at 340-41, Doc. 75-4 at 6-7.)  Ms. Velazco responded that she

would like to go in and get Wesley's parents, because he was a minor at the time.[5]

(*Id.*)   She then went inside and shut the door.  (*Id.*)

Ms. Velazco went upstairs to get Mr. and Mrs. Brand, who were in their

bedroom.  (*Id.*; Tam. Brand Dep. at 123.)  Mrs. Brand was nursing their 7-month-

old child while they watched the 11 o'clock news.  (Tam. Brand Dep. at 124-25.)

Ms. Velazco knocked on the Brands' door and said the police had arrived

with a warrant for Wesley.  (*Id.*)  Mrs. and Mr. Brand went downstairs to speak

---

[5] In her deposition, Ms. Velazco testified she told Deputy Casal that she would go "get his mother and father."  (Velazco Dep. at 16:23-17:17.)

with the officer, with Mr. Brand holding the child.  (*Id.* at 126:7-12.)  Ms. Velazco followed the Brands downstairs and sat "[a]bout five steps up" the stairs from the foyer level.  (*Id.* at 110:22-23; Velazco Dep. at 23:16-24:7.)

### B.  Initial encounter at the threshold

Mrs. Brand[6] answered the front door.  Deputy Casal was still standing in front of the outer storm door so that it could not close.  (Tam. Brand Dep. at 130:13-22.)  As soon as Mrs. Brand opened the front door, Deputy Casal put his foot inside the doorjamb so that the front door itself could not shut.  (Tam. Brand Statement ¶ 13; Tam. Brand Dep. at 90:1-8; Tam. Brand Dep. Ex. 2-6, Doc. 50-1 at 9.)  Mrs. Brand and Deputy Casal had not yet started talking when he did so.

Deputy Casal explained that he had an arrest warrant for Wesley Brand. (Defs.' SMF ¶ 28; Pls.' Resp. SMF ¶ 28.)  According to Mrs. Brand,[7] Deputy Casal stated that "he had a warrant for Wesley Brand, a 27-year-old white male."  (Tam. Brand Dep. at 131:2-5.)  Mrs. Brand asked if he wanted Wesley Brand or a 27-year-old white male.  (*Id.* at 131:7-11.)  Deputy Casal repeated that he wanted Wesley Brand, a 27-year-old white male.  Mrs. Brand was confused "[b]ecause Wesley was 17 and he's not white."  (*Id.* at 131:12-17.)  Casal then asked if Wesley was home.  (*Id.* at 131:24.)  Mrs. Brand answered, "I don't know."  (*Id.* at 131:24-25.)  She asked, "Well, do you want Wesley" or a 27-year-old white male – "because they're not one in the same."  (*Id.* at 132:1-3.)

---

[6] At the time of the incident, Tamara Brand was five feet, four inches tall and weighed 250 pounds.  (Defs.' SMF ¶ 27; Pls.' Resp. SMF ¶ 27; Tam. Brand Dep. at 212.)

[7] The record does not reflect whether Defendants dispute Mrs. Brand's account of her initial conversation with Deputy Casal.

Still, Mrs. Brand confirmed that Wesley Brand was her son.  (Defs.' SMF ¶ 29; Pls.' Resp. SMF ¶ 29.)  Deputy Casal asked whether Wesley was home, and Mrs. Brand responded that she did not know.  (Defs.' SMF ¶ 30; Pls.' Resp. SMF ¶ 30.)  Mrs. Brand said she did not know where Wesley was, but she was expecting him home the next day.  (Defs.' SMF ¶ 31; Pls.' Resp. SMF ¶ 31.)

During this exchange, Mrs. Brand called out for Wesley.  (Velazco Dep. at 29:5-6; Theo Brand Dep. at 51:1-4.)  Having heard his name and some part of the verbal volleys, Wesley then appeared at the front door, stopped briefly in the foyer area inside the house, and then stepped outside onto the porch area.  (Defs.' SMF ¶¶ 37, 40; Pls.' Resp. SMF ¶ 37, 40; Tam. Brand Dep. at 133:6-134:10; Deposition of Wesley Brand at 23:12-20, Doc. 65; Theo Brand Dep. at 51, 54.)  According to Mr. Brand, Deputy Casal inspected his photo of Wesley,[8] looked confused and said to Mrs. Brand, "Ma'am, I need to come inside."  (Defs.' SMF ¶ 41; Pls.' Resp. SMF ¶ 41.)[9]

---

[8] To cut to the quick, based on the totality of the evidence in the record that the parties seem to dance around, because of the description of Wesley Brand in the arrest warrant as a 27-year-old white male and Plaintiffs' testimony about what Deputy Casal said at the threshold, it is apparent that Deputy Casal was expecting a 27-year-old white male.  Wesley, who is not 27 and is mixed race, was dressed and appeared as a female (facts which none of the parties actually disputes here).

[9] In support of SMF ¶ 41, Defendants cite to the deposition of Theo Brand.  In his deposition Theo Brand does not state that Deputy Casal looked confused.  Rather, he testified: "Wesley steps out the door to the ledge of the porch, and then he -- [Casal] looked up, looked at the picture, and looked at the -- the piece of paper that he had. . . . He stood right there for a minute, and then he kind of just stood there looking. And he's like, Ma'am, I need to come inside. And my wife said, Well, why. And he said, Ma'am, I need to come inside."  (Theo Brand Dep. at 54.)  Nonetheless, Plaintiffs admit to Defendants' characterization of this testimony as stated in SMF ¶ 41 as to Deputy Casal appearing confused.  Indeed, Wesley testified, "I guess I didn't fit the description of what he was looking for, and he tried to gain entry."  (Wesley Dep. at 32:5-7.)

Mrs. Brand refused to allow Casal inside the home because he did not have a search warrant and because Wesley was already outside and waiting for Deputy Casal to arrest him.  (Defs.' SMF ¶ 42; Pls.' Resp. SMF ¶ 42.)  At her criminal trial, Mrs. Brand summarized Deputy Casal's discussion with her as follows:

> Officer Casal puts his foot back in the door and says: Let me in.  And I'm like, kind of: If you have a search warrant.  [Then he said] I don't need a search warrant. I was like: You do if you want to come in.  [  ]  So we're bantering back and forth.  He said he didn't need a search warrant.  I said: You do if you want to come in. [He said] I have an arrrest warrant.  [I said] Exactly, you have an arrest warrant.  Wesley is with you.  [He said] I'm going to arrest you for obstruction.  [I said] What am I obstructing?  *You have Wesley.*  You have the arrest warrant for Wesley.  *You have him to arrest.  I'm not stopping you from doing that.*  [He said] An arrest warrant gives me the right to come in the house.  [I said] No.  I was like all so frustrated because I don't know what is going on.  So I'm like: What is it that you're looking for?  What do you want?  I don't understand.  You know.  And he says he's coming in again.  And I say: Show me the warrant.  [He said] I don't have to show you a warrant. It was like I'm exhausting everything.  Okay, it has to exist.  Has a judge signed the warrant?  [ ] [H]e's like: Do you understand English?  Do you have ID?  I'm like: Wesley call 911.

(Doc. 75-6 at 5:21-7:7 (emphasis added).)

During the discussion, Wesley went back inside the house.  (Defs.' SMF ¶ 45; Pls.' Resp. SMF ¶ 45.)  In response to repeated requests by Deputy Casal to enter the house based on the arrest warrant, Mrs. Brand refused and stood blocking the doorway.  (Defs.' SMF ¶ 46; Pls.' Resp. SMF ¶ 46.)

According to Plaintiffs, Deputy Casal then grabbed Mrs. Brand by the shirt and tried to pull her out of the doorway.  (Defs.' SMF ¶ 47; Pls.' Resp. SMF ¶ 47.)  Mrs. Brand resisted and held onto the door frame.  (Defs.' SMF ¶ 48; Pls.' Resp.

SMF ¶ 48.)  During this exchange, Mrs. Brand's shirt ripped and Deputy Casal stumbled back on the porch.  (Defs.' SMF ¶ 49; Pls.' Resp. SMF ¶ 49; Theo Brand Dep. at 56; Tam. Brand Dep. at 147:6-13.)     The front pocket ripped off, and the shirt was torn in other places such that Mrs. Brand's entire stomach, her chest including her bra, and parts of her back were exposed.  (*Id.* at 202-203, 205.) According to Mrs. Brand, "not only could individuals see through [her] bra, but because of the tear, individuals could see [her] breasts."  (Tam. Brand Aff. ¶ 2; *see also* Wesley Brand Dep. at 58:14-15.)[10]

## C.    Deputy Pardinas joins Deputy Casal and tases Mrs. Brand

At some point during these events at the front door, Deputy Pardinas announced over the radio that she had a positive identification on the wanted subject — Wesley Brand — in the back room.  (Casal Incident Report; Dispatcher Audio Tape at 3:12 ("Are you aware there is another adult that possibly matches our description in the house?").)  Deputy Casal did not respond.  Deputy Pardinas radioed him again and asked if he copied.  (Dispatcher Audio Tape at 3:20.) Deputy Pardinas testified, "He didn't say anything [in response to that second call], so my red flag goes straight up, and I know something is wrong."

---

[10] Defendants seek to contradict Mrs. Brand and other's testimony by offering two booking photographs of Mrs. Brand – one of her back and one of her side – as well as a video of Mr. Brand putting on Mrs. Brand's shirt.  These pieces of evidence do not "blatantly contradict" Mrs. Brand's testimony.  *See Scott*, 550 U.S. at 380.  The photographs taken that night do not show Mrs. Brand's front.  (In fact, as Plaintiffs point out, the frontal photo is conspicuously absent from the Deputies' submissions.)  And the video shows only a slim gentleman putting on a large ripped shirt.  A reasonable jury could find based on its evaluation of the testimony and evidence that the shirt exposed portions of Mrs. Brand body on the night in question.

(Deposition of Teresa Pardinas at 42:5-24, Doc. 48 (affirming testimony in prior criminal case).)[11]

The Dispatcher Audio Tape makes clear that Deputy Casal then radioed for Deputy Pardinas to come to where he was, and he also called for the dispatcher to "start additional units to this location."   (Dispatcher Audio Tape at 3:23.) According to Deputy Pardinas, as she came around to the front of the home, she saw Deputy Casal in a struggle/physical altercation with someone from the inside the doorway of the house.  (Defs.' SMF ¶¶ 54-55; Pardinas Dep. Ex. 8 & 9, Teresa Pardinas Use of Force Report, Doc. 48 at 31.[12])  Plaintiffs dispute that there was an altercation and that Pardinas could have seen what transpired on the front porch from her location in the yard.  (Tam. Brand Statement ¶ 26; *see also* Theo Brand Dep. at 61:18-62:6.)

Deputy Pardinas then came up the stairs and entered the front door of the house.  (Tam. Brand Dep. at 154:7-9.)  Both Tamara Brand and Wesley Brand were inside the house when Pardinas entered.  Deputy Casal remained on the front porch.  According to Plaintiffs, Deputy Pardinas ordered everyone to get back.  (Defs.' SMF ¶ 60; Pls.' Resp. SMF ¶ 60.)  Deputy Pardinas explained that they had an arrest warrant, turned to Wesley and asked if it was him, and confirmed that he was the subject of the warrant.  (Tam Brand Dep. at 154-55.).

---

[11] Plaintiffs dispute that Pardinas made these radio calls, relying on a written dispatch log. However, the audio recording indisputably contains Pardinas's radio communications.
[12] Deputy Pardinas's Use of Force Report is properly before the Court on summary judgment because it, too, is officer testimony that "could be reduced to admissible evidence at trial." *Macuba*, 193 F.3d at 1323.

According to Mrs. Brand, she then demanded that Deputy Pardinas leave their house.[13]   (*Id.*; Defs.' SMF ¶ 62; Pls.' Resp. SMF ¶ 62.)

Mrs. Brand then turned to Ms. Velazco, who was sitting on the stairs, and asked for a phone to call 911.   (Defs.' SMF ¶ 63; Pls.' Resp. SMF ¶ 63.)   Mrs. Brand stepped up a stair and reached for the phone, and Ms. Velazco handed it to her.   (Tam. Brand Dep. at 159:3.)   According to Plaintiffs, Deputy Pardinas ordered Mrs. Brand to drop the phone.   (Tam. Brand Dep. at 159:6; Velazco Dep. at 41:12; 73:10; Defs.' SMF ¶ 64; Pls.' Resp. SMF ¶ 64 (admitting that this statement was made).)   Mrs. Brand did not drop the phone but instead responded that she was calling 911.   (Tam. Brand Dep. at 159; Defs.' SMF ¶ 65; Pls.' Resp. SMF ¶ 65.)   According to Mrs. Brand, as she was dialing the phone, Deputy Pardinas tased her.   (Defs.' SMF ¶ 66; Pls.' Resp. SMF ¶ 66; Tam. Brand Dep. at 159-60.)   Deputy Pardinas was standing "two feet" from Mrs. Brand when Pardinas deployed her X26 taser.   (Tam. Brand Dep. at 190:13-14.)   As Mrs. Brand was being tased, she fell down into the foyer area.   (*Id.* at 163:12-14; Tam. Brand Dep. Ex. 6, Doc. 50-2 at 18.)

### D.   Post-Tasing Events

When Mr. Brand became upset after his wife was tased, Deputy Pardinas responded by unholstering her gun and repeatedly yelling for Mr. Brand and Wesley to get back.   (Theo Brand Dep. at 66-67; Defs.' SMF ¶ 68; Pls.' Resp. SMF

---

[13] Mrs. Brand testified that she said to Deputy Pardinas, "[D]id you see what your partner did? . . . He knocked me down.  I'm pregnant."  (Tam. Brand Dep. at 154:20-22.)

¶ 68.)   At that point, according to Mr. Brand, Deputy Casal entered the home from his position on the porch.  (*Id.* at 71:15-18.)

Deputy Pardinas attempted to handcuff Mrs. Brand and ordered her to lay flat on her stomach.  (Defs.' SMF ¶ 69; Pls.' Resp. SMF ¶ 69.)   Mrs. Brand responded that she cannot lay flat because she is pregnant.  (Tam. Brand Dep. at 172:25; Defs.' SMF ¶ 71; Pls.' Resp. SMF ¶ 71.)  Mrs. Brand, while laying face-down, kept one of her knees "elbowed out" to protect her stomach.  (Tam. Brand Dep. at 171:2-3.)  Deputy Pardinas came around and kicked Mrs. Brand's leg back more than once in an attempt to get her into a fully prone position.  (*Id.* at 173; Defs.' SMF ¶ 72; Pls.' Resp. SMF ¶ 72.)  Mrs. Brand said to Deputy Pardinas that she couldn't put the leg back because it was "broke."  (*Id.*)  Mrs. Brand was eventually handcuffed.  (Defs.' SMF ¶ 72; Pls.' Resp. SMF ¶ 72; Tam. Brand Dep. at 173:21-24.)

Mrs. Brand requested an ambulance be called.  (Defs.' SMF ¶ 76; Pls.' Resp. SMF ¶ 76.)  The medics attended to Mrs. Brand for about 30 minutes.  (Defs.' SMF ¶ 87; Pls.' Resp. SMF ¶ 87.)  She declined transport to the hospital.  (Defs.' SMF ¶ 88; Pls.' Resp. SMF ¶ 88.)

Other officers who had been called to the scene arrived and entered the home.  Deputy Casal testified that a total of "eight to nine" officers entered the Brands' home that night.  (Casal Dep. at 28:3-5; 56.)[14]  Deputy Casal told the

---

[14] Though the specific number of officers who entered the Brands' home that night was not contained in Defendants' Statement of Material Facts, all witnesses agree that it was a substantial number of officers.

officers that neither the upstairs nor the downstairs were clear.  (Defs.' SMF ¶ 81; Pls.' Resp. SMF ¶ 81.)  Deputy Casal testified that he was the "primary officer" that night, (Casal Dep. at 24), and that he "directed [the officers] to certain places." (*Id.* at 25:1-3).  In addition, he testified:

> Q: [ ] My question is this: For the officers that you sent into each room, what did you tell them to do?
>
> A. To search.

(*Id.* at 29:5-7.)

Deputy Casal himself only went in the kitchen, foyer, and lower den area, all of which are adjacent to one another.  (Defs.' SMF ¶ 83; Pls.' Resp. SMF ¶ 83.) Deputy Pardinas stayed in the general foyer and adjacent den area.  (Defs.' SMF ¶ 84; Pls.' Resp. SMF ¶ 84.)  She did not direct any officer to perform any search. (Defs.' SMF ¶ 85; Pls.' Resp. SMF ¶ 85.)  The protective sweep took only a few minutes.[15]  (Defs.' SMF ¶ 86; Pls.' Resp. SMF ¶ 86.)

According to Mrs. Brand, after Deputy Pardinas removed the taser probes from Mrs. Brand's body, she "took no steps to rearrange" Mrs. Brand's shirt, (Tam. Brand Statement ¶ 20), leaving Mrs. Brand's bra "completely exposed." (*Id.*)  According to Mrs. Brand, "[e]very officer that came in – they came two by two.  I said you don't belong in my house.  Can I have a shirt?" (Tam. Brand Dep. at 175.)  According to Plaintiffs, Deputy Pardinas denied their repeated requests

---

[15] According to Plaintiffs, the officers went through "pretty much everything" in "[a]ll the rooms in the house."  (Theo Brand Dep. at 73:4-9.)  In addition to searching closets, the officers were "going through drawers." (*Id.* at 73:4-5.)

to get Mrs. Brand another shirt.  (Tam. Brand Dep. at 174-75; Wesley Brand Dep. at 59-60; Theo Brand Dep. at 194-195.)

Despite the requirement of LR 56.B(2)(b), NDGa, that Plaintiffs present additional material facts in a separate statement, Plaintiffs did not do so in response to Defendant's Motion.  Nonetheless, because some of the following evidence actually contained in the record is necessary to evaluate certain of Defendants' contentions, the Court references this record evidence in this Order so as to provide additional factual content, where appropriate, here.  According to Mrs. Brand, she experienced some pain in her previously injured left knee and a chipped tooth as a result of the tasing and the force used during the arrest. (Defs.' SMF ¶¶ 96, 98; Pls.' Resp. SMF ¶¶ 96, 98.)   After the incident, Mrs. Brand's left breast hurt for about a week from being grabbed by Mr. Casal.  (Tam. Brand Dep. at 37:24-38:7.)  Mrs. Brand's back was sore for about two weeks from the punctures caused by the taser probes.  (*Id.* at 38:20-39:20.)  Mrs. Brand's left leg, which had been very seriously injured in a softball game years before, (*id.* at 40-42), caused her pain for "at least" a month and a half.  (*Id.* at 48:16-25.)

Mrs. Brand also experienced other psychological consequences as a result of the events that night.  As a result of those events, Mrs. Brand now takes Xanax for insomnia, Paxil for depression, and Lamictal for racing thoughts.  (*Id.* at 62-71.)[16]  Her relationship with her husband changed, too; she no longer feels an

---

[16] Mrs. Brand can no longer sleep without medication.  (Tam. Brand Dep. at 72:8-13 ("I'll go 72 hours without sleep if I don't take medication now.  Q That's still true today?  A Today.  Q And

emotional connection to him because he didn't go through what she went through.  (*Id*. at 251, 254-56.)  Their sexual activity has diminished significantly.  (*Id*. at 256-57.)  Even though they raised eight kids together, she is no longer emotionally accessible to him.  (*Id*. at 258:14-259:1.)  They no longer go out to eat together or go to parks as a family because, as she testified, "I don't go anywhere. [ ] I don't leave." (*Id*. at 258:16-24.)

Mrs. Brand was charged with obstructing a law enforcement officer by swinging her arms at him and cruelty to children in the third degree for performing a violent act in front of a child (her infant whom she had been nursing).  (Trial Trans. at 433:16-25, Doc. 75-8 at 16.)  At trial, after the prosecution rested, Mrs. Brand moved for an acquittal on the second charge based on the lack of any evidence that any witness to any violence was under 18 and therefore a child.  The motion was denied.  (Trial Trans. at 338:22-25.)  The jury then acquitted her on both counts.

## III.   DISCUSSION

The Amended Complaint contains twelve counts, six of which appear to be federal constitutional violations and the other six of which appear to be violations of the Georgia Constitution or Georgia law.  The federal claims, all of which are based on violations of rights arising out of the Fourth and Fourteenth Amendments to the U.S. Constitution, are analyzed first, in chronological order.

---

that started when?  A Immediately [after the events in this case].").  And when she does sleep, she sleeps in her clothes so that she is "ready to go." (*Id*. at 264:9-12.)

### A.  Qualified Immunity

Defendants argue that they are entitled to qualified immunity for all of Plaintiffs' federal claims.  "The purpose of qualified immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)) (internal quotation marks omitted).  Officials seeking qualified immunity must first establish that they were acting within their discretionary authority when the alleged constitutional violation occurred.  *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009).  If so, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate.  *Id.*; *McClish*, 483 F.3d at 1237.

For each claim, Plaintiffs must make two showings when challenging Defendants' qualified immunity defenses.[17]  First, a plaintiff must show that a defendant's conduct violated a constitutional right.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The Court must review the facts in connection with the alleged violation in the light most favorable to the non-movant.  *McClish*, 483 F.3d at 1237.

Second, a plaintiff must show that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  A right is clearly established if it would have been clear to a reasonable officer that the officers'

---

[17] The Court can begin the qualified immunity analysis with either inquiry. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

conduct was unlawful.  *See, e.g., Saucier*, 533 U.S. at 201-02; *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).  The "salient question" is whether the state of the law gave the defendant "fair warning" that his alleged conduct was unconstitutional.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  The Court "looks only to binding precedent — cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose — to determine whether the right in question was clearly established at the time of the violation."  *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

At the outset, the Court notes that there is no evident dispute over whether Defendants were acting within their discretionary authority.  "[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  *Roberts v. Spielman*, 643 F.3d 899, 903 (11th Cir. 2011) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)).  The Court is satisfied that Defendants were clearly acting in their discretionary authority during the relevant events of February 7 and 8, 2011.  Thus, the Court turns to Plaintiffs' Fourth and Fourteenth Amendment claims against Defendants.

### B.    Fourth Amendment in General

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "At the Amendment's 'very core' stands 'the

18

right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "A warrantless and nonconsensual entry into a person's home, and any resulting search or seizure, violates the Fourth Amendment unless it is supported by both probable cause and exigent circumstances." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)); *Bashir v. Rockdale Cty., Ga.*, 445 F.3d 1323, 1330 (11th Cir. 2006) (holding that deputies' entry into the Plaintiff's home without a warrant, exigent circumstances, or consent clearly violated established Fourth Amendment law). "The private property immediately adjacent to a home" — the "curtilage" — "is entitled to the same protection against unreasonable search and seizure as the home itself." *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

Defendants did not have a search warrant for 4179 Valley Brook Road. Rather, they had an arrest warrant for Wesley Brand that did not contain an address. Nonetheless, an arrest warrant can justify entering a home so long as a two-part test laid out by the U.S. Supreme Court in *Payton*, 445 U.S. at 603, is met:

> [I]n order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief

> [1] that the location to be searched is the suspect's dwelling, and
>
> [2] that the suspect is within the residence at the time of entry.

*United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995).  In the Eleventh Circuit, common sense factors guide both prongs of the *Payton* test.  *United States v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir. 2000).  For example, "officers may presume that a person is at home at certain times of the day." *Magluta*, 44 F.3d at 1535.  Officers may also presume that a suspect still lives in a house where he lived six months ago, because "[r]esidency in a house . . . generally is not transitory or ephemeral, but instead endures for some length of time." *Bervaldi*, 226 F.3d at 1265.  These presumptions may be rebutted by contrary evidence. *Magluta*, 44 F.3d at 1535.

Absent satisfaction of the two-prong test, "any physical invasion of the structure of the home, by even a fraction of an inch, is too much." *Moore v. Pederson*, --- F.3d ---, No. 14-14201, 2015 WL 5973304, *5 (11th Cir. Oct. 15, 2015) (punctuation omitted) (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001)).

### C.  Deputy Pardinas's entry into Plaintiffs' backyard without a search warrant

The first alleged search of the Brands' home occurred when Deputy Pardinas went into the Brands' backyard while Deputy Casal went to the front door.  Plaintiffs claim Deputy Pardinas unlawfully entered their protected curtilage by hurdling a locked chain link gate and peering into windows on the

backside of their home when she did not have a reasonable belief that it was Wesley's residence or that Wesley was there at the time. Plaintiffs also assert that Deputy Casal can be held liable for his participation in the plan that resulted in Deputy Pardinas going around to the back of the home.[18] Deputy Pardinas argues, first and foremost, that she had a reasonable belief that Wesley lived at 4179 Valley Brook Road and a reasonable belief that he was there at the time.

Plaintiffs bear the burden of demonstrating that Deputy Pardinas is not entitled to qualified immunity for her alleged unlawful search of the Brands' curtilage. To do so, Plaintiffs must show, based on the evidence viewed in the light most favorable to them, that Deputy Pardinas's entry into the backyard was a clearly established violation of their Fourth Amendment rights.

Under Prong 1 of the *Payton* test, Plaintiffs must show that Deputy Pardinas did not have a reasonable belief that 4179 Valley Brook Road was Wesley Brand's residence at the time she entered onto an area protected by the Fourth Amendment. There are no factual disputes on this issue. Before she went into the backyard, the only information she had before her was that contained in the warrant packet that Deputy Casal put together. (Pardinas Dep. at 84-86; 90:6-10.) This packet included the arrest warrant and the Gwinnett County Jail Booking Sheet from four months prior including an address for Wesley Brand at 4179 Valley Brook Road. (Pardinas Dep. at 84-86.) Deputy Pardinas testified, "I went to the back to prevent escape of the warrant suspect. This was a matter of

---

[18] The claim against Deputy Pardinas is analyzed first, because if no violation occurred, then Deputy Casal cannot be liable, either.

standard protocol." (Pardinas Decl. ¶ 6.)  This is the only evidence in the record as to what Deputy Pardinas knew at the time she went to the back of the home.

In the Court's previous order on Plaintiffs' Motion for Partial Summary Judgment, the Court drew all reasonable inferences from this evidence in Deputy Pardinas's favor and found a reasonable jury could find she had a reasonable belief that Wesley lived at the residence.  (Doc. 86 at 18-21.)  Here, for two primary reasons, the Court comes to the same result even when drawing all inferences in favor of Plaintiffs.

First, under the clearly established law in the Eleventh Circuit, four months is not long enough to make home address data so stale as to be unreliable, at least when the address listed is a house.  That is so because "[r]esidency in a house . . . generally is not transitory or ephemeral, but instead endures for some length of time." *Bervaldi*, 226 F.3d at 1265 (finding reasonable belief of residency based on a six-month old address).  And second, even one source as to a suspect's residential address — here, the booking sheet — can be sufficient to supply a reasonable belief. *See United States v. De Parias*, 805 F.2d 1447, 1457 (11th Cir. 1986) (affirming reasonable belief that suspect lived at residence where officers received information from a single source: an apartment manager) *overruled on other grounds by United States v. Kaplan*, 171 F.3d 1351 (11th Cir. 1999).

Plaintiffs point to Deputy Casal's testimony and argue that the Court can reasonably infer that Deputy Pardinas held his same beliefs.  However, the Court considers only "the facts and circumstances within the knowledge of the law

enforcement agents," *Magluta*, 44 F.3d at 1533, not what another officer stated about his own subjective beliefs at the time. Plaintiffs also argue that both Defendants should have done more investigation into Wesley's residential address, but the Eleventh Circuit has resisted requiring officers to do exhaustive record searches for a suspect's residential address. *See Bervaldi*, 226 F.3d at 1266-67 ("[T]he law does not currently impose a requirement to check utility records or property records. Although the officers could have checked into these matters, we do not believe that their failure to do so is inconsistent with a reasonable belief that Deridder resided at 129th Avenue.").

Accordingly, based on the limited facts in the summary judgment record, even when construed most favorably to Plaintiffs, Deputy Pardinas had reason to believe Wesley lived at 4179 Valley Brook Road.

Similarly, no jury could conclude that Deputy Pardinas lacked facts sufficient to supply a reasonable belief that Wesley was at the address at the time she went around to the backyard. To start, the warrant was executed around 11:00 PM on a Monday night, and "officers may presume that a person is at home at certain times of the day — a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule." *Magluta*, 44 F.3d at 1533. Plaintiffs have presented no evidence regarding Wesley's known schedule. If it is reasonable for officers to presume a person is home at 6:00 AM, *Bervaldi*, 226 F.3d at 1267, it is just as reasonable for officers to presume a person is home at 11:00 PM. *See id.*

In addition, a vehicle was parked in the driveway during the incident. (Tam. Brand Dep. at 119:1-3; Velazco Dep. at 20:23-21:2.)  No evidence indicates that Deputy Pardinas knew the vehicle was registered to Theo Brand rather than Wesley Brand before she went around back.  Regardless of whether she did, the fact that a vehicle was "parked at the residence only buttresses the belief that persons were at the house, including presumably [Wesley]."  *Bervaldi*, 226 F.3d at 1267.

Accordingly, construing this evidence in the light most favorable to Plaintiffs, no reasonable jury could find a violation was committed here. Plaintiffs have pointed to no evidence to indicate that it would have been clear to a reasonable officer that Deputy Pardinas's conduct was unlawful.  *See, e.g.*, *Saucier*, 533 U.S. at 201-02; *Fils*, 647 F.3d at 1287.  Accordingly, Deputy Pardinas is entitled to qualified immunity for her entrance into the Brands' backyard during the execution of the arrest warrant.[19]  Defendants' Motion for Summary Judgment is therefore **GRANTED** on this Fourth Amendment claim.

### D.   Deputy Casal's entry through the front door without a search warrant

Plaintiffs allege Deputy Casal unlawfully entered their home for three reasons.  First, he unlawfully stuck his foot in the doorjamb as soon as Mrs. Brand opened the door.  Second, he did not leave when Mrs. Brand told him he could not come inside.  And third, he entered after Deputy Pardinas had already gone through the front door.  Deputy Casal argues that he was entitled to enter

---

[19] Consequently, Deputy Casal is also entitled to qualified immunity.

the home for multiple reasons, including satisfaction of the *Payton* test, exigent circumstances, and his ability to lawfully arrest Mrs. Brand for obstruction after she resisted his entry into her home.

Without a warrant or other justifying circumstances, "any physical invasion of the structure of the home, by even a fraction of an inch, is too much." *Moore v. Pederson*, 2015 WL 5973304, *5 (punctuation omitted) (quoting *Kyllo*, 533 U.S. at 37). Starting with the *Payton* test, Deputy Casal's entrance into the home, like Deputy Pardinas's into the backyard, does not violate the Fourth Amendment if "the facts and circumstances within" his knowledge, when viewed in the totality, "warrant a reasonable belief that [1] the location to be searched is the suspect's dwelling, and [2] the suspect is within the residence at the time of entry." *Magluta*, 44 F.3d at 1533. And again, common sense factors guide both prongs of the test. *Bervaldi*, 226 F.3d at 1263. On Defendants' Motion, the Court accepts Plaintiffs' version of the facts as true and draws all reasonable inferences in their favor.

Defendant Casal's own testimony casts doubt on the reasonableness of any belief he might have held as to Wesley's residential address. In particular, it is undisputed that Deputy Casal did not "know" 4179 Valley Brook Road was Wesley Brand's residential address at the time Deputy Pardinas went around to the back of the Brands' home. As he testified:

> Q. Okay. When you went to the house on February the 7th, 2011, did
> you know that Wesley Brand lived at that address?

A. No, I didn't.

Q. Okay. When you go to serve a warrant, an arrest warrant, do you think it is required that you know that the person lives there before you go to that address?

A. Well, a lot of times we get third-party warrants, and the only way to -- sometimes the only way to know that they're living there is to actually go to that address.

. . .

Q. Okay. By the time you got to the house, was it a first-party warrant or a third-party warrant?

A. Third-party.

. . .

Q. Is it your testimony that an arrest warrant gave you the authority to enter a third-person's house?
. . .

A. Just the arrest warrant, a third-party warrant?

Q. Yes.

A. No.

Q. Okay. And other than the fact that the person is located at that house, what else do you have to have before it gives you authority?

A. I have to have additional information.

(Casal Dep. at 19-23.)   Although neither party attempts to define the terms "third-party warrant" and "first-party warrant" in the briefing, it appears from Casal's testimony that he considered a "third-party warrant" as a warrant to be served on someone at a third party's home, consistent with *Steagald v. United States*, 451 U.S. 204, 214-16 (1981).

26

When Deputy Casal arrived to serve this third-party warrant, he ran the license plate number on the car in the driveway and found out it was registered to "Theotis Brand, 4179 Valley Brook Road." (Dispatcher Audio Tape at 2:30.) He then went upstairs and met Ms. Velazco, who was standing outside the entrance to the home smoking a cigarette. Deputy Casal, who was dressed in uniform, said he was looking for Wesley. Ms. Velazco responded that she would go get Wesley's parents.[20] It is undisputed that the warrant Deputy Casal served listed Wesley not as the minor that he was at the time, but as a 27-year-old.

Accepting Plaintiffs' version of the evidence as true and construing it in the light most favorable to them, a reasonable jury could indeed find that an officer in Deputy Casal's position, given the totality of the facts and circumstances before him, did not have a reasonable belief that Wesley resided at 4179 Valley Brook Road, and that he had simply given his parents' address during a prior arrest. *Bervaldi*, 226 F.3d at 1263 (finding that officers may use their common sense to presume that a 27-year-old might list his parents' address as his residence when he does not in fact live there because "in a sense it may be a more permanent or fixed address than the address of their own residence"). Deputy Casal testified that he treated the warrant as a third-party warrant and that he did not know the

---

[20] Defendants contend that Ms. Velazco told Deputy Casal that Wesley was a minor. However, her trial testimony, to which Defendants point, is not clear on this. She testified: "I was sitting outside on the front porch, and I was approached by an officer who had asked me if Wesley was there. He showed me a picture. *I said: Well, I would like to go in and get his parents, because he was a minor at the time*." (Doc. 75-4 at 6-7 (emphasis added).) Construed in the light most favorable to Plaintiffs, "because he was a minor at the time" was Ms. Velazco's explanation to the jury as to why she went to get Wesley's parents, but was not what she actually said to Deputy Casal.

address was Wesley's residence.  He also thought Wesley was 27 years old.  When he ran the plates on the car in the driveway, it was registered to a different Brand.  When he spoke with Ms. Velazco, she said she would go get Wesley's parents.  When Mrs. Brand answered the door and Deputy Casal put his foot in the doorjamb, common sense would indicate that 4179 Valley Brook Road was Wesley's parents' home.

Defendants assert that prior to his entry into the Plaintiffs' home, Deputy Casal developed the reasonable belief that Wesley resided at 4179 Valley Brook Road because he learned at the scene that Wesley was a juvenile over whom Plaintiffs had custody and learned about Wesley's living arrangements at Plaintiffs' home.  The record construed in Plaintiffs favor, however, does not support this version of events.  To start, there is no indication that Deputy Casal was informed at any time prior to the criminal trial or the depositions in this case that Wesley "was free to come and go" from the Brands home or was privy to any arrangement whereby Wesley was allowed to spend the night at his parents' home at his pleasure.  The evidence construed in favor of Plaintiffs reasonably suggests this was a post-hoc justification of Deputy Casal's actions.  Defendants further assert that a reasonable officer would have relied on Mrs. Brand's statements that she did not know whether her son was "home" as an indication that Wesley lived at that address.  But under Plaintiffs' version of the facts, Deputy Casal had already stuck his foot in the door before he was confronted with this information, too.

Accordingly, Plaintiffs have met their burden and presented evidence that, when viewed in the proper light, demonstrates that a reasonable officer would be on fair notice that sticking his foot in the doorjamb before speaking with Mrs. Brand was unlawful.  *See McClish*, 483 F.3d at 1235-36 (holding that an officer who, without a warrant, or probable cause along with exigent circumstances or consent, "reached into [a] house, grabbed [the plaintiff], and forcibly pulled him out onto the porch" in order to arrest him, violated the plaintiff's Fourth Amendment rights).

Construing the evidence in the light most favorable to Plaintiffs, Deputy Casal continued to attempt to enter the home even after Wesley volunteered himself for arrest and was standing outside on the porch.  (*See* Doc. 75-6 at 5:21-7:7 ("You have Wesley.  You have the arrest warrant for Wesley.  You have him to arrest.  I'm not stopping you from doing that.  [He said] [a]n arrest warrant gives me the right to come in the house.").)  Deputy Casal then tried to pull Mrs. Brand out of the doorway so he could enter.  When her shirt ripped as he pulled her and he stumbled back, Deputy Pardinas then entered the home,[21] clearing the way for Deputy Casal to finally enter all the way into the home.  A reasonable jury could infer that this series of events represents a continuous attempt on behalf of Deputy Casal to enter the Brands' home.  And because the entrance violated the

---

[21] Of course, Deputy Pardinas was in a very different position from Deputy Casal with regard to the events at the front door, as she was not privy to the conversation leading up to Deputy Casal's alleged pulling Mrs. Brand outside the door.

Brands' clearly established rights from the moment Deputy Casal stuck his foot in the door, Defendants' Motion is **DENIED** as to his entry into the home.

### E.   Deputy Pardinas's entry through the front door without a search warrant

Plaintiffs claim Deputy Pardinas unlawfully entered the front door of the Brands' residence in violation of the Fourth Amendment.   Deputy Pardinas argues that she is entitled to qualified immunity because she satisfied the *Payton* two-part test, which the Court has already addressed above.   Deputy Pardinas also argues that exigent circumstances justified the entry because her calls to Deputy Casal went unanswered, she heard him call for backup, and then she saw him in a struggle at the front door.   As to the exigent circumstances argument, Plaintiffs respond that she cannot rely on the exigent circumstances doctrine both because she did not plead it and because any exigent circumstances were created by her partner when he attempted to pull Mrs. Brand out of her home.

Because Deputy Pardinas's entry pursuant to the arrest warrant was lawful under *Payton*, the Court need not decide whether exigent circumstances also justified the entry.   As explained above, the Court found Deputy Pardinas did not violate Plaintiffs' Fourth Amendment rights when she entered the Plaintiffs' backyard during the course of serving the arrest warrant on Wesley Brand.   The same information that permitted her entry into the backyard also permitted her entry into the front door to arrest Wesley Brand.[22]   Deputy Pardinas is therefore

---

[22] According to Deputy Pardinas, she had also seen Wesley in the back room of the house, lending more reasonableness to her belief that he was home at the time.  (*See* Dispatcher Audio

entitled to qualified immunity for her entrance into the front door of the Brands' home.  Defendants' Motion is **GRANTED** as to this claim.

### F.   Deputy Pardinas's tasing Mrs. Brand

After Deputy Pardinas entered the Brands' home, she tased Mrs. Brand. Mrs. Brand claims this tasing constituted excessive force under the Fourth Amendment for several reasons: (1) Deputy Pardinas violated the Gwinnett County use of force policies in her taser use; (2) Deputy Pardinas did not have probable cause to arrest Mrs. Brand; and (3) the facts observed by Deputy Pardinas established that there was no need for the application of force.  Deputy Pardinas seeks summary judgment on the claim, arguing it was not clearly established that it would be unlawful to tase Mrs. Brand under these circumstances.  Specifically, Deputy Pardinas testified she observed Mrs. Brand physically resist Deputy Casal and subsequently, Pardinas entered a hectic situation in the home, was surrounded by residents, and Mrs. Brand then disobeyed a lawful command to cease use of her cell phone for calling 911.

The Fourth Amendment's guarantee of freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an arrest.  *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989); *Mercado v. City of Orlando*, 407 F.3d 1152, 1156-57 (11th Cir. 2005).  A

---

Tape at 3:12 (containing audio of Deputy Pardinas asking Deputy Casal, "Are you aware there is another adult that possibly matches our description in the house?").)  While Plaintiffs do not dispute that Deputy Pardinas made that statement over the radio, they do dispute that she could have seen Wesley in the back room at all, even while inside their backyard.  (*See* Tam. Brand Statement ¶ 6, Doc. 71 ("We always closed the blinds when we lived at 4179 Valley Brook and the night of my arrest was no exception.").)

claim of excessive force used during the course of an arrest is analyzed through the lens of the Fourth Amendment's "objective reasonableness" standard. *Graham*, 490 U.S. at 395-96 (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)); *McCullough v. Antolini*, 559 F.3d 1201, 1205-06 (11th Cir. 2009). Reasonableness is "judged from the perspective of the reasonable officer on the scene" without the benefit of hindsight.  *Graham*, 490 U.S. at at 396; *Fils*, 647 F.3d at 1287.  "In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'"  *Lee*, 284 F.3d at 1197 (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1188 (11th Cir. 2001)); *Vinyard*, 311 F.3d at 1347 ("The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer.").  This standard "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Determining whether the level and type of force used in this case[23] was objectively reasonable under the Fourth Amendment requires balancing the nature and quality of the intrusion on the individual's rights with the government

---

[23] To the extent the excessive force inquiry begins with an analysis of whether Deputy Pardinas's had arguable probable cause to arrest Mrs. Brand, the Court recognizes in the false arrest section below that she did.  *See Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) ("We begin our inquiry, therefore, with the question of whether [the officer] had probable cause or arguable probable cause to arrest [the suspect].").

interests at stake.  *See Graham*, 490 U.S. at 396; *Tennessee v. Garner*, 471 U.S. at 9; *see also Fils*, 647 F.3d at 1288.  Some degree of physical coercion is inherent in making an arrest.  *Lee*, 284 F.3d at 1197; *McCullough*, 559 F.3d at 1206.  "Indeed, the typical arrest involves some force and injury, and the use of force is an expected, necessary part of a law enforcement officer[']s task of subduing and securing individuals suspected of committing crimes."  *Lee*, 284 F.3d at 1198 (citations and quotations omitted); *Rodriguez*, 280 F.3d at 1351; *see also Nolin v. Isbell*, 207 F.3d 1253, 1257-58 (11th Cir. 2000). That said, "even *de minimis* force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." *Zivojinovich v. Barner*, 525 F.3d 1059, 1071 (11th Cir. 2008) (per curiam); *see also Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008).

The force used by a police officer in carrying out an otherwise lawful arrest must be reasonably proportionate to the need for that force.  *Vineyard*, 311 F.3d at 1347.  In other words, officers may use force that is "necessary in the situation at hand." *Lee*, 284 F.3d at 1197 (11th Cir. 2002) (quotations omitted). In evaluating whether the force used was excessive under the specific circumstances of the case, courts consider such factors as: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Vinyard*, 311 F.3d at 1347; *see also Graham*, 490 U.S. at 396 (referring to these same factors).

The following facts are construed in Plaintiffs' favor: Shortly before midnight, Mrs. Brand answered the door of her home to Deputy Casal purportedly looking for Wesley Brand, described by Deputy Casal as a 27-year-old white man. Deputy Casal immediately stuck his foot in the doorjamb so the door could not be closed. After Wesley, who was 17 at the time and dressed as a female, appeared and stepped out onto the porch, Deputy Casal insisted that Mrs. Brand let him enter the home. Mrs. Brand refused to let him in the house without a search warrant. Deputy Casal then grabbed her by the shirt and tried to pull her out of the doorway. Mrs. Brand resisted and held on to the doorframe, her shirt ripped from the force of Deputy Casal's tugging, and, as a result, Deputy Casal stumbled back onto the porch.

Deputy Pardinas then came around from the back of the home, up the front stairs, entered the home with her taser drawn, and ordered everyone to get back. According to Plaintiffs, after Deputy Pardinas had entered her home, Mrs. Brand explained that Deputy Casal had tried to drag her out of her own home despite the fact that she was pregnant and that the subject of the arrest warrant, Wesley, had already presented himself to Deputy Casal. Deputy Pardinas confirmed Wesley's identity. Mrs. Brand demanded that Deputy Pardinas leave, turned and asked Ms. Velazco (who was sitting on the stairs) for a phone, and then stepped up onto the stairs to retrieve the phone from Ms. Velazco. Deputy Pardinas ordered Mrs. Brand to drop the phone. Mrs. Brand did not drop the phone but instead responded out loud that she was calling 911. That was the point,

according to Mrs. Brand, at which Deputy Pardinas tased her.  (Tam. Brand Dep. at 159-60.)  According to Ms. Velazco, "the only aggressive acts came from the officers."  (Velazco Dep. at 40:8-9.)

According to Defendants' brief, the force used was reasonable and justified under the circumstances which the brief describes as follows:

> In particular, just before using the Taser, Mrs. Brand was moving up a stairway and had refused a lawful command to drop the phone. Additionally, Deputy Pardinas was in the midst of a response to an emergency call for backup from her partner, who she saw engaged in a fight with one or more residents from the house. Then, as Deputy Pardinas rushed into a small, enclosed area of the residence, she had a man on each side of her and two women (Mrs. Brand and Ms. Velazco) in front of her. All were combatants so far as Pardinas knew, and any of the residents could have been armed. . . .  In sum, when Deputy Pardinas used the Taser, Mrs. Brand was a large, belligerent, combative suspect who was subject to arrest for multiple offenses.  Mrs. Brand refused a lawful order and threatened to further destabilize an already tense and dangerous situation. Therefore, Deputy Pardinas had lawful authority to utilize force reasonably necessary to arrest Plaintiff and coerce her compliance.

(Mot. at 37-38.)  Pardinas relies on the Eleventh Circuit's decision in *Draper v. Reynolds*, that a single taser shock against a "hostile, belligerent, and uncooperative" suspect, which did not cause any serious injury and left the suspect "coherent" and "calmed" shortly after the shock, was proportionate and reasonable.[24]  369 F.3d 1270, 1278 (11th Cir. 2004).  Defendants essentially argue that after *Draper*, the law in the Eleventh Circuit is that an officer is entitled to the use of one free tase during the course of an arrest.

---

[24] *Draper* is distinguishable on many obvious grounds, the first being it was decided with the benefit of video footage of the tasing from the police cruiser's dash cam.

This Court rejects such a proposition.  Although reasonableness is judged from the perspective of the officer on the scene, the Eleventh Circuit has also held that "[r]easonableness cuts both ways, however. At summary judgment, [the Court] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the [Plaintiff] and determine whether the officer's use of force was excessive under those circumstances." *Fils*, 647 F.3d at 1288 (citing *Vinyard*, 311 F.3d at 1347-48 (evaluating, at summary judgment, the allegedly excessive force under the facts as described by the Plaintiff, notwithstanding the defendant-officer's different version of events)).  The Court's conclusion is driven by the stark difference between the Plaintiffs' and Defendants' versions of the facts.  At summary judgment, the Court must accept the Plaintiffs' version of events, and make all reasonable inferences in their favor.  The Court acknowledges that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Morton v. Kirkwood*, 707 F.3d 1273, 1280 (11th Cir. 2013); *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (quoting *Lee*, 284 F.3d at 1190).  At trial, credibility determinations may cause the trier of fact to discount Plaintiffs' version of the incident, but the Court may not do so here.

Construing the evidence in Plaintiffs' favor, Pardinas's use of force in tasing Mrs. Brand was obviously excessive under the *Graham* factors. First, although Mrs. Brand was eventually arrested by Deputy Casal (and subsequently

acquitted) for obstruction and cruelty to children in the third degree[25] (for performing an act of alleged violence in front of a minor during the arrest), she was not the subject of the arrest warrant on the night of the incident.  Under Plaintiffs' version, the only alleged violence was committed by Deputies Casal and Pardinas.  And Mrs. Brand's alleged obstruction of the arrest of her son and Deputy Casal's entry into her home "without force does not connote a level of dangerousness that would justify a greater use of force."  *See Fils*, 647 F.3d at 1288 (discussing crimes of disorderly conduct and resisting arrest).[26]

Second, a reasonable jury could find that Mrs. Brand posed "no immediate threat to the safety of the officers" or anyone else.  Defendants have not offered any evidence in conjunction with their summary judgment motion indicating that Mrs. Brand made any aggressive move toward either officer.[27]  Interestingly, although Defendants describe Mrs. Brand as having been a combatant and engaging in a fight with Deputy Casal in argument in their brief, Defendants did not include any such evidence in their statement of material facts.  And Defendants in fact adopted Plaintiffs' version of the interactions with Casal and

---

[25] The Court does not mean to imply that a substantiated charge of cruelty to children in the third degree for performing an act of violence in front of a minor would not be a serious crime. The Court simply finds, on the record presented on this motion as construed in Plaintiffs' favor, that the force used relative to the crime charged was unreasonable.  *See Fils*, 647 F.3d at 1289 (noting that "[a]lthough he was charged with resisting arrest, [the plaintiff's] version of events shows that he did not ignore any verbal instructions, nor did he attempt to free himself from Bergert's control once he was on the ground").

[26] While *Fils* was decided shortly after the incident at issue here, the Court of Appeals clearly articulated that its decision was not breaking any new ground – that the principles underlying its decision were well established and obvious.  *Id.* at 1291-92.

[27] To the extent the Gwinnett County Sheriff's Office Use of Force policy is relevant, it permits an officer to use a taser to "contro[l] the adversary," (Doc. 74-3 at 4), or "to control a combative subject."  (Doc. 74-5 at 4.)  The facts before this Court on Defendants' Motion do not indicate Mrs. Brand was combative.

Pardinas in their supporting statement of material facts.  Thus, for purposes of Defendants' summary judgment motion, Plaintiffs' version of the facts is undisputed.

Under those facts, Mrs. Brand did not fight with Deputy Casal but was instead assaulted by Deputy Casal who attempted to forcibly remove her from the doorway of her home.  Deputy Pardinas claims to have observed this "physical altercation," and a reasonable inference, for purposes of Defendants' motion, is that she saw precisely what Mrs. Brand says occurred – Deputy Casal stumbling back onto the porch after unsuccessfully attempting to remove Mrs. Brand from the threshold of her home.  Based on the record presented here, Deputy Pardinas entered the home and was told by Mrs. Brand that she had been the victim of Deputy Casal's assault and was calling 911 when the officers refused to leave her home.  When Mrs. Brand did not drop the phone on Pardinas's command, Pardinas immediately tased Mrs. Brand.  Deputy Pardinas did not inform Mrs. Brand that she was under arrest, she did not order Mrs. Brand to put her hands up or get down on the ground, and she did not warn Mrs. Brand that if she refused to put down the phone she would be tased.   Under Plaintiffs' facts, undisputed for purposes of Defendants' Motion, the only directive Mrs. Brand ignored was Pardinas's command to drop the phone she was using to call 911 for help with the disturbance in her home.

Third, a reasonable jury could find, based on Plaintiffs' version of the facts as summarized above, that Mrs. Brand was not actively resisting arrest (she had

not even been told by Pardinas she was under arrest at that time) or attempting to escape when she was tased by Deputy Pardinas. Indeed, the undisputed facts construed in her favor give rise to the opposite inference – she was in her own home attempting to call 911 for additional on-scene assistance.

In determining the reasonableness of the force used, the Court may also consider the extent of the injury inflicted. *Lee*, 84 F.3d at 1197-98. To start, Plaintiff chipped her tooth as a result of the tasing. (Tam. Brand Dep. at 32:21-22.) Plaintiff also testified that the tasing in her own home has had extensive psychological ramifications, including estrangement from her family, emotional and physical estrangement from her husband, insomnia, depression, and racing thoughts. As of her deposition in this case, Mrs. Brand was still taking Xanax for the insomnia, Paxil for the depression, and Lamictal for the racing thoughts, all of which she was prescribed as a result of the events giving rise to this lawsuit. (Tam. Brand Dep. at 62-71.)

Although there are some distinctions, the circumstances in this case are materially parallel to those in *Fils v. City of Aventura*. There, the Eleventh Circuit held that the tasing by police officers of a man outside a night club constituted excessive force in violation of his Fourth Amendment rights where, under his version of the facts, he was not violent, he did not disobey orders, he did not resist arrest, and he posed no risk to the officers or anyone else at the

club. *Fils*, 647 F.3d at 1288-90.[28]  The Court summarized the facts relevant to the

plaintiff's claim, as viewed in the light most favorable to him:

> Following the arrest of the female partygoer and her friend, the crowd outside the club was not rowdy, but rather was "calm." Maurice had his back turned to the parking lot—and to the group of police officers—and was having a conversation with the promoter. During that conversation, Maurice told the promoter that he thought that "they're overreacting, these motherfuckers are overreacting"— "they" presumably meaning the police. Having overheard Maurice, [Officer] Bergert walked up to Maurice's back and said, "what you said, motherfucker?" and pulled out his taser. Maurice turned around, saw [Officer] Bergert's weapon, put his hands up, and took one step backward. Without any verbal warning, [Officer] Bergert shot his taser into Maurice's chest and delivered an electric shock . . . After the incident, Maurice was charged with resisting arrest without force and disorderly conduct.

*Id.* at 1288.  The officers, however, provided a substantially different account of

the events surrounding Maurice's arrest:

> Bergert's police report states that he approached Maurice because he was "yelling and attempting to incite a crowd by yelling 'fuck that, you cops ain't right.' " Bergert's report asserts that this action, combined with the twenty-to-thirty-person crowd, caused a security concern. Bergert claims that he then ordered Maurice to leave the area. Maurice refused and yelled more obscenities at Bergert, who then told Maurice that he was under arrest. According to Bergert, Maurice did not comply, and instead "took a fighting stance" against him. It was at this point that Bergert fired his taser into Maurice's chest.

*Id.* at 1278.

As is the case here, it is noteworthy that in *Fils* there were completely

conflicting facts regarding some parts of the events and not as to others.  The

police as a whole saw the situation (occurring in the middle of the night outside a

---

[28] *See*, again, *supra* n.26.

club) as chaotic with a crowd of about 15 to 20 people (growing, according to the police to 45) gathering outside a club versus Maurice's view that things were calm.[29]   And of course, the police and Maurice and his witness had sharply conflicting views of what had happened and how obedient or threatening/non-threating Maurice had been.   Under Defendants' version of the facts, one could see how the police portrayed Maurice's conduct in a threatening manner and arguably had reason to feel very threatened.   Compelled to accept plaintiff Maurice's version of the facts and construe them in his favor however, the Court concluded that the tasing was obviously excessive under the circumstances and under the Supreme Court's *Graham* factors:

> First, the crime for which Maurice was arrested was not serious. Disorderly conduct is not a serious offense. *Vinyard*, 311 F.3d at 1347. . . Second, Maurice clearly did not present a threat to Bergert's safety, or to the safety of anyone else. According to Maurice, he was merely having a private conversation before Bergert approached him, taser drawn. When he saw the taser, Maurice put his hands in the air and took a step away from Bergert. And, because Bergert issued no warnings or directives to move, Maurice clearly did not disobey any orders. . .   Third, Maurice was not resisting arrest or attempting to escape. Although he was charged with resisting arrest, Maurice's version of events shows that he did not ignore any verbal instructions. . . .

*Id.* 1288-89.

The *Fils* Court reasoned that its decision was in line with other excessive force cases from the circuit, which, "put together[,] establish that unprovoked force against a non-hostile and non-violent suspect who has not disobeyed

---

[29] Deputies Casal and Pardinas similarly describe the situation in Plaintiffs' home, being surrounded by 4 residents, as hectic and volatile.

instructions violates that suspect's rights under the Fourth Amendment." *Id.* at 1289.  These cases confirm that "non-violent suspects, accused of minor crimes, who have not resisted arrest—just like Maurice—are victims of constitutional abuse when police used extreme force to subdue them." *Id.*; *see also Hadley v. Gutierrez,* 526 F.3d 1324, 1330 (11th Cir. 2008) (holding that officer used excessive force when he punched the plaintiff in the stomach while the plaintiff was handcuffed and not resisting arrest); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 923-24 (11th Cir. 2000) (holding that officer used excessive force when he released his police dog to attack the plaintiff, who was accused of a minor, non-violent offense, who had obeyed every police command, and who was lying still on the ground when the officer released his dog).  For example, in *Vinyard v. Wilson*, the plaintiff was arrested by the defendant-officer for disorderly conduct and obstructing a law enforcement officer.  311 F.3d at 1344.  The defendant-officer handcuffed the plaintiff and sat her in the back seat of his patrol car, which had a plexiglass screen between the front and back seat.  *Id.* at 1343.  During the ride from the scene to the police station, the plaintiff and defendant-officer exchanged verbal abuse.  *Id.*  Tired of that abuse, the defendant-officer pulled the car to the side of the road, exited the vehicle, opened the door to the back seat, pulled the plaintiff by the hair, and sprayed her in the eyes with pepper spray.  *Id.*  The Court found that where the plaintiff's crime was minor, she did not pose a threat to anyone, and there was no indication that she resisted arrest or attempted to flee, the defendant-officer's use of pepper spray

42

was "plainly excessive, wholly unnecessary, and indeed, grossly disproportionate under [the factors from] *Graham*."   *Id.* at 1347-48 (quoting *Lee*, 284 F.3d at 1198).

Although none of these cases involved a taser, the *Fils* Court found no meaningful distinction under these circumstances.   *Fils*, 647 F.3d at 1289.   The Eleventh Circuit further recognized in *Fils* that

> the use of tasers or other weapons . . . 'could be appropriate where an officer reasonably believes the suspect is violent,' *See  McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1244–45 (11th Cir. 2003) (holding that use of pepper spray to a suspect's face was reasonable where the officer had probable cause to believe that the suspect had committed a violent felony and was still armed with a weapon). And, where a suspect appears "hostile, belligerent, and uncooperative," use of a taser might be preferable to a "physical struggle [causing] serious harm" to the suspect or the officer. *See Draper*, 369 F.3d at 1278 (approving of an officer's use of a taser against a suspect at a traffic stop who "used profanity, moved around and paced in agitation, ... repeatedly yelled at" the officer, and did not comply with verbal commands).

*Id.* at 1289-90.   Those are not the circumstances this Court must accept in determining Defendants' motion.   Under Plaintiffs' version of the facts, there is no indication that the officers reasonably believed Mrs. Brand was violent, nor is there any indication that she was poised to engage in a physical struggle with Deputy Pardinas at the time she was tased while on the telephone attempting to call 911.

The *Fils* decision did not create new law.   It simply highlighted the Circuit's existing principles, in cases with circumstances such as the ones in this case, that under *Graham* the unwarranted use of significant or blunt force is objectively

unreasonable under the Fourth Amendment.  *See, e.g.*, *Vinyard*, 311 F.3d at 1347-48 (holding that it violates the Fourth Amendment to use pepper spray on an individual suspected of resisting an officer when that individual was not posing a threat); *see also Powell v. Haddock*, 366 F. App'x 29, 31 (11th Cir. 2010) (holding that it was clearly established that officer's use of taser against a non-threatening suspect when the alleged crime of the suspect is a minor offense was unconstitutional considering suspect who had "simply taken steps away from Deputy Stone before Deputy Rackard deployed his taser the first time" and where "[t]here was no evidence that [her] 'behavior was violent, aggressive, and prolonged' or that she was a 'danger to herself and others'").  Thus, under Plaintiffs' facts, which Defendants have put forward and this Court must accept, Deputy Pardinas should have been on notice that it was not reasonably proportionate to tase a woman in her own home for not dropping a telephone when the woman said she was calling 911.  The law was clearly established that Deputy Pardinas's conduct, as described by Mrs. Brand, violated Mrs. Brand's constitutional right to be free from excessive force.  No objectively reasonable police officer could believe that she could tase a woman in her home for calling 911 after another officer grabbed her and attempted to pull her from her doorway simply because she had verbally objected to the officers' entry into her home. Based on these facts only, Deputy Pardinas's Motion is therefore **DENIED** as to Plaintiffs' excessive force claim.

### G.   Both Deputies' arrest of Mrs. Brand

Mrs. Brand claims both deputies falsely arrested her in violation of her constitutional rights.   Both Deputies seek summary judgment on those claims, asserting that they had at least arguable probable cause to arrest Mrs. Brand for obstruction of a law enforcement officer under O.C.G.A. § 16-10-24(a),[30] disorderly conduct under O.C.G.A. § 16-11-39,[31] and cruelty to a child under O.C.G.A. § 16-5-70(d).[32]   They also argue that the denial of Mrs. Brand's directed verdict motion in her criminal trial is a legal determination that the officers had probable cause.

---

[30] "(a) Except as otherwise provided in subsection (b) of this Code section, a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor."  O.C.G.A. § 16-10-24(a) (1986).

[31] "(a) A person commits the offense of disorderly conduct when such person commits any of the following:
> (1) Acts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health;
> (2) Acts in a violent or tumultuous manner toward another person whereby the property of such person is placed in danger of being damaged or destroyed;
> (3) Without provocation, uses to or of another person in such other person's presence, opprobrious or abusive words which by their very utterance tend to incite to an immediate breach of the peace, that is to say, words which as a matter of common knowledge and under ordinary circumstances will, when used to or of another person in such other person's presence, naturally tend to provoke violent resentment, that is, words commonly called "fighting words"; or
> (4) Without provocation, uses obscene and vulgar or profane language in the presence of or by telephone to a person under the age of 14 years which threatens an immediate breach of the peace."
O.C.G.A. § 16-11-39 (1995).

[32] "(d) Any person commits the offense of cruelty to children in the third degree when:
> (1) Such person, who is the primary aggressor, intentionally allows a child under the age of 18 to witness the commission of a forcible felony, battery, or family violence battery; or
> (2) Such person, who is the primary aggressor, having knowledge that a child under the age of 18 is present and sees or hears the act, commits a forcible felony, battery, or family violence battery."
O.C.G.A. § 16-5-70(d) (2004).

Mrs. Brand was tried and acquitted on two charges: obstruction under O.C.G.A. § 16-10-24(a) and cruelty to a child in the third degree under O.C.G.A. § 16-5-70(d).  At the close of the state's case, (Doc. 75-4 at 2:8), before the jury found her not guilty, Mrs. Brand moved for a directed verdict of acquittal on the cruelty to a child charge.  (*Id.* at 3.)  The motion was denied.  (*Id.* at 4:22-25.)

Both Deputies argue, albeit in another part of their briefs, that the denial of Mrs. Brand's motion for a directed verdict of acquittal in her criminal trial is a binding determination that the Deputies had probable cause under state law to arrest Mrs. Brand.  Mrs. Brand does not disagree, but contends that the denial of the directed verdict is sufficiently rebutted because "[i]t must be said that defendants have lied from the day the event happened."  (Resp. at 50.)

An arrest without probable cause violates the Fourth Amendment right to be free from unreasonable searches and seizures.  *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003).  An officer has probable cause to make an arrest when "the facts and circumstances within the *officer's knowledge*, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Id.* (emphasis in original; internal citations omitted).  Probable cause to arrest a suspect for *any* offense entitles an officer to qualified immunity from a false arrest claim.  *See Durruthy*, 351 F.3d at 1090 n.6 (emphasis added).

In Georgia, the denial of a motion for directed verdict of acquittal in a criminal case is a binding determination of the existence of probable cause:

> When the trial judge, having heard all of the state's evidence, considers a motion on behalf of an accused (the accused being present and given an opportunity to be heard in support of the motion); and when the trial judge rules that the evidence is sufficient as a matter of law to support a conviction (that is, is sufficient to enable a rational trier of fact to find each and every element of the guilt of the accused beyond a reasonable doubt), we can see no reason why such a holding - unreversed and in *the absence of fraud or corruption* - should not suffice as to the existence of probable cause.

*Monroe v. Sigler*, 353 S.E.2d 23, 25 (Ga. 1987) (emphasis added).  This, the "*Monroe* Rule," bars a subsequent claim for false arrest or malicious prosecution.[33]  *See Remeneski v. Klinakis*, 473 S.E.2d 223, 228 (Ga. Ct. App. 1996); *Poole v. Bell*, No. 5:09-CV-233 MTT, 2012 WL 1074291, at *7 (M.D. Ga. Mar. 29, 2012).

As emphasized in the above excerpt, the *Monroe* Rule contains an exception for "fraud or corruption."  *Monroe*, 353 S.E.2d at 25.  Mrs. Brand appears to argue that officers lying "from the day the event happened," (Resp. at 50), is the type of "fraud or corruption" that invokes the exception.  The Court is not persuaded.

In *Akins v. Warren*, 375 S.E.2d 605, 606 (Ga. 1989), the Georgia Supreme Court discussed the type of evidence of fraud or corruption that a plaintiff would need to provide and how the process worked in the summary judgment context.

---

[33] As discussed in the malicious prosecution section below, the analysis of that claim is slightly different.

In that case, Warren contended that his employer, Akins, maliciously prosecuted him by telling an officer that Warren had taken property from Akins when Akins was actually just trying to collect a debt.   In the underlying criminal trial, the court denied Warren's motion for directed verdict before the jury ultimately acquitted him of the crime of theft by taking.   In the subsequent malicious prosecution trial, the Court described the effect of a denial of a directed verdict as follows:

> Warren alleged in his complaint there was an absence of probable cause for the criminal prosecution. This is a necessary element in his claim. Akins offered evidence on motion for summary judgment to pierce that allegation when he showed the denial of the motion for directed verdict in the criminal case. The burden then shifted to Warren to offer counter evidence and generate a genuine issue of fact whether probable cause existed. He could have done this with evidence, if he had any, of perjured testimony delivered by Akins during the criminal trial of such a nature as to constitute the perpetration of a fraud upon the court; or with evidence of other conduct by Akins amounting to an intentional corruption of the criminal trial. (Example: The prosecuting witness bribes the judge to deny the motion for directed verdict of acquittal.) In the absence of any such evidence, as required by *Monroe*, summary judgment for Akins was proper.
>
> It is true that Warren alleged Akins acted falsely but that allegation was not an element necessary to his claim. It does not alter the duty to come forward with evidence on summary judgment. The contention of Warren that Akins was only trying to recover a debt through the use of criminal prosecution was presented in the criminal case during cross-examination and heard by the trial judge before the denial of the motion for directed verdict.

*Id.*

Here, according to Mrs. Brand, Deputy Casal said: (1) he wanted to come in to her home after Wesley was outside on the porch; (2) he did not need a search

warrant; and (3) he was going to arrest her for obstruction.  She objected and refused to allow him entrance.  The Deputies' stories are — and particularly Deputy Casal's story of the initial confrontation is — quite different from Mrs. Brand's story.[34]  The evidence Mrs. Brand offers to support her claim of fraud on the court is her own testimony and that of other witnesses that the situation did not occur as the Deputies have consistently testified that it occurred.

That sort of factual dispute is not the type of hoax that brings a case into the *Monroe* exception for fraud or corruption.  The Deputies' alleged lies were a central theme of the theory of the case in Mrs. Brand's criminal trial.  (*See* Defense Opening Statement, Crim. Trial Trans. at 283:21-23, Doc. 75-1 at 11 ("Now, what I submit to you is that this case, as you listen to the evidence, is going to be about two officers who are covering up for each other.").) Furthermore, both Deputy Casal and Deputy Pardinas were extensively cross-examined (and Deputy Casal even re-crossed) in the underlying criminal trial. (*See* Crim. Trial Trans., Casal Cross Examination, Doc. 75-2 at 8-19, 75-3 at 1-5; Casal Re-cross examination, Doc. 75-3 at 6-12; Pardinas Cross Examination Doc. 75-3 at 21-23, 75-4 at 1-2.)  Mrs. Brand's attorney in the criminal trial thoroughly probed the factual basis of Deputy Casal's Incident Report, and he specifically questioned Deputy Casal on "the actual physical interaction between you and Ms. Brand," (Doc. 75-2 at 13:15-16), for well over six pages of transcript.  Deputy

---

[34] Of course, on this Motion, the Court accepts Mrs. Brand's facts as true and draws all reasonable inferences in her favor.  The Court only references Defendants' testimony here to discuss the differences between their story and that of the Plaintiffs.

Casal's testimonial evidence in this case has been consistent with his trial testimony. While Plaintiffs may be correct and he may in fact have lied, Plaintiffs have not offered the type of evidence that would establish perjury, fraud or corruption as contemplated in the cases discussed above. Plaintiffs have simply demonstrated the existence of conflicting factual accounts.

Courts in other cases have required more. In the sole Georgia case cited by Mrs. Brand, *Wolf Camera, Inc. v. Royter*, 558 S.E.2d 797 (Ga. Ct. App. 2002), individuals participated in a scheme to get a colleague, Royter, arrested. They hid exculpatory evidence both from the arresting officer and from the soliciter, they destroyed evidence that could have proven Royter's innocence, and they admitted at trial that some of their statements to the arresting officer had been unfounded. *Id.* at 800. The court there held that Royter had met his burden, on summary judgment, of submitting evidence "which could support a determination by the jury that the defendants acted in unison to frame Royter and conceal exculpatory evidence." *Id.* at 801. In addition, "the trial court's denial of Royter's motion for directed verdict was based on evidence which the jury found to be disingenuous." *Id.* No such facts exist in our case. Here, it is one word against others.

Accordingly, even based on the evidence construed in the light most favorable to Mrs. Brand and resolving all factual disputes in her favor, Mrs. Brand has not offered sufficient evidence to overcome the presumption of probable cause created by the denial of Mrs. Brand's motion for a directed verdict of acquittal in her criminal trial. Where there is a legally implicit finding of

probable cause, there can be no false arrest, *see Remeneski*, 473 S.E.2d at 228, so Defendants' Motion is therefore **GRANTED** as to the false arrest claims under both federal and state law.

### H.    Both Deputies' protective sweep

Plaintiffs claim that Defendants are liable for a protective sweep that was not justified, quick, or limited.  Defendants argue that they, personally, only performed a search incident to Wesley and Mrs. Brand's arrests.  They also argue that even if they or other officers at the scene performed a protective sweep, it was justified.

According to Deputies Casal and Pardinas, each entered some of the rooms and stairways immediately adjacent to the foyer.  On the facts as construed on this Motion, the Court finds that Defendants performed a protective sweep rather than the prototypical[35] search incident to arrest because the officers did not search only within the "grab area" immediately surrounding Wesley or Mrs. Brand:

> In *Chimel*, the Supreme Court held that for personal safety and to prevent the loss of evidence, an arresting officer may conduct a prompt warrantless search of the arrestee and of his "grab area." The grab area has been construed to mean "the area from within which [the defendant] might gain possession of a weapon or destructible evidence."  *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694 (1969).

---

[35] Technically, a protective sweep is also a search that is incident to an arrest, but "search incident to arrest" has acquired a very specific meaning in Fourth Amendment jurisprudence. *Compare* Donald F. Samuel, Eleventh Circuit Crim. Handbook, § 127 Search Incident to Arrest (2015) *with* Donald F. Samuel, Eleventh Circuit Crim. Handbook, § 133 Security Sweep (2015).

*United States v. Ricks*, 817 F.2d 692, 696 (11th Cir. 1987).  A search must fall within the grab area to qualify as a search incident to arrest.  Here, the Deputies looked in adjoining rooms — well outside the grab area of either suspect — so it cannot be found that the Deputies performed a mere search incident to arrest.

However, that does not make the protective sweep illegal.  In *Maryland v. Buie*, the Supreme Court explained that "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."  494 U.S. 325, 327 (1990).  *Buie* authorizes protective sweeps in two scenarios.  First, officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" without probable cause or reasonable suspicion.  *Id.* at 334.  Mrs. Brand testified as to the layout of the Brands' home.  (*See* Tam. Brand Dep. Ex. 3, Floor plan of the Brands' home, Doc. 50-2 at 15.)  Plaintiffs do not argue that Deputy Casal or Deputy Pardinas personally searched outside of what are shown to be rooms immediately adjoining the foyer where Mrs. Brand was tased.  These searches were authorized under the first *Buie* scenario.  Plaintiffs do not argue that Deputy Pardinas is liable for anything other than cursorily viewing these rooms, so Defendants' Motion is **GRANTED** as to the protective sweep claim against Deputy Pardinas.  Defendants' Motion is also **GRANTED** as to the claim against Deputy Casal for his personal viewing of these rooms.

Plaintiffs also argue that Deputy Casal is liable, due to his role and his active leadership, for other officers' violations during a broader protective sweep

that evening.  That brings the Court to the second *Buie* scenario: the search beyond the immediately adjoining rooms.  This broader protective sweep is constrained by the following three requirements.  *Id.* at 334-36.  First, the sweep may occur only when "the searching officer 'possesse[s] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing' . . . that the area swept harbored an individual posing a danger to the officer or others." *Id.* at 334 (quoting *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983)).  Second, the sweep "may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335.  Third, "[t]he sweep [may] last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

Resolving all factual disputes and drawing all reasonable inferences in Plaintiffs' favor, no specific and articulable facts justified the broader search as it was conducted.  According to Plaintiffs' testimony, Deputy Casal initiated the skirmish at the threshold when he tried to pull Mrs. Brand out of her home and ripped her shirt.  After explaining the situation to Deputy Pardinas, Mrs. Brand attempted to call 911 and was tased.

Mr. Brand started "freaking" after his wife, whom he believed to be pregnant, was tased.  (Theo Brand Dep. at 66:16.)  He said to Deputy Pardinas, "What the fuck's wrong with you?" and Deputy Pardinas respond by "pull[ing] out her gun on me and my son" and "yelling and screaming to get back, get back,

get the fuck back." (*Id.* at 66:16-67:1.)  But, according to Plaintiffs' testimony, at no point did anyone threaten or physically fight the officers.  Ms. Velazco was seated on the stairs and did not disobey any commands.  When the Deputies asked Wesley and Mr. Brand to sit down, they did.  (Wesley Dep. at 51:17-52:2; 52:14-19.)  Simply put, no evidence supports an objectively reasonable belief that the area swept — the entire house — harbored an individual posing a danger to the officers or others.

Defendants argue that the manner of the arrest (by tasing), the likelihood that houses contain deadly weapons such as knives, and the presence of an unrelated third party (Ms. Velazco) — though she was in fact a resident of the home — support a reasonable belief of potentially dangerous attackers elsewhere in the home.  To start, the Court does not accept that tasing a suspect by itself can justify a protective sweep, or all officers who wanted to sweep a home would simply tase the resident.  As to the presence of deadly weapons in the home, there is no evidence in the record from which a jury could conclude that the Plaintiffs were harboring weapons in their home.  And even if Mrs. Brand had been armed with, say, a knife — which is not the case here — even that evidence, standing alone, would not justify a sweep of the home.  The dangerousness of an arrestee:

> "implies nothing regarding the possible presence of anyone being in [the warehouse]—the touchstone of the protective sweep analysis." *Sharrar* [v. Felsing, 128 F.3d 810, 825 (3d Cir. 1997)]; *see also* [*United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996)] ("The facts on which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from an attack by a third

party during the arrest, not the dangerousness of the arrested individual.")

*United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999).

Finally, as to the third-party argument, neither of Defendants' cited authority supports the proposition that the mere presence, in the open, of a peaceful, obedient third-party supports a protective sweep. *Tobin*, a narcotics case, involved a resident who lied about the presence of others in the home and officers who knew that he had lied. 923 F.2d at 1511. Construing the evidence in the light most favorable to Plaintiffs, neither Mrs. Brand nor anyone else lied about Wesley's presence. And in another narcotics case, *United States v. Hromada*, 49 F.3d 685 (11th Cir. 1995), the officers had previously observed the suspect with what they presumed was a girlfriend and were notified "that the suspect had at least one roommate." *Id.* at 687. The *Hromada* court also noted the connection between illegal drug operations and guns and violence, and, in fact, the officers found some guns in Hromada's home. *Id.* at 688 n.4, 689. The Deputies here had no information about the presence of third persons nor any indication that an illegal drug operation was afoot. Thus, unlike in this case, the officers in both *Tobin* and *Hromada* had specific, articulable reasons to believe the home contained other individuals (who were potentially dangerous due to their involvement in the illegal drug trade).[36]

---

[36] Defendants also argue that they "were entitled to rely upon apparently reasonable police protocols, which dictated calling EMS and sweeping the residence." (Doc. 60-4 at 26.) No evidence was cited to support that argument. To the extent Defendants were relying on the Gwinnett County Sheriff's Office Policy Manual chapter on "Use of Force/Firearms," (Doc. 74-3

Accepting Plaintiffs' (and Wesley and Ms. Velazco's) testimony as true, the Deputies in this case had no specific and articulable reason to believe that the residence contained anyone other than those individuals before them, and they also had no specific and articulable reason to believe any individual would pose a danger to the Deputies or others.  Defendants do not contend that they patted anyone down during the entire incident – not even Wesley, who according to Deputy Casal had violently resisted Deputy Casal at the front door.  (Casal Dep. at 29:24-30:1.)  A reasonable jury could also infer that Wesley was not placed in handcuffs for quite some time because Defendants did not perceive him as posing any threat.  (Pardinas Dep. at 92:10-93:16.)  Nor was Mrs. Brand handcuffed until after the EMTs arrived, when she was medically cleared and the taser probes were removed from her back.  (*Id.* at 93:20-94:3.)  Given the officers' nonchalance, a reasonable jury could find that no facts supported the belief that the home harbored anyone dangerous at all.[37]  *Buie* clearly established that such reasons are necessary, so, as in *Chaves*, "in the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or

---

at 1 through 74-5 at 10), that policy does not appear to support Defendants' argument.  (*See* Doc. 74-5 at 6 (stating only, "Medical staff shall check each subject who has been exposed to the probes of the TASER," but not indicating that the subject should not be moved or that a protective sweep should be performed).)  Moreover, this 'I was just following orders' argument is disputed by Deputy Pardinas's own testimony that she chose not to take Wesley and Mrs. Brand outside instead of performing the protective sweep "[b]ecause [her] discretion at the time was not to."  (Pardinas Dep. at 94:23-24.)

[37] The Court notes that both Deputies, in their respective depositions, articulated reasons for performing the protective sweep.  (*See* Casal Dep. at 34-35; Pardinas Dep. at 99:18-100:14.)  However, all of the articulated factual reasons are contradicted by Plaintiffs' testimony.  On this Motion, the Court resolves all factual disputes against the movant Deputies and does not weigh credibility.

others, was inside the [home], the officers' lack of information cannot justify the warrantless sweep in this case." *Chaves*, 169 F.3d at 692.[38]

Plaintiffs contend that Deputy Casal is liable because he directed this broader protective sweep. "A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation." *Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1165 (11th Cir. 2005). "[I]t is clear that the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation." *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 999 (11th Cir. 1995) (quotation omitted).

In *Jackson v. Cosby*, this Court, relying on *Troupe*, *Swint*, and *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986), held that a reasonable jury might conclude an officer caused an unlawful entry into a home where "[a]ll evidence in the record indicate[d] that that [officers] commenced their search of Plaintiff's home only after Defendant Cosby indicated to them that he had obtained Plaintiff's consent" and instructed them that they could search the home. No. 1:12-cv-4447-AT, Doc. 60 at 16 (N.D. Ga. Sept. 5, 2014).

---

[38] As to the reasonableness of the scope of the search, Mr. Brand testified that the officers "were going through drawers" and "pretty much everything [in a]ll the rooms in the house." (Theo Brand Dep. at 73:4-9.)  As a protective sweep must be limited to spaces in which an individual person could be found, the evidence construed in Plaintiffs' favor indicates a scope violation as well.  An individual could not launch an attack from a drawer.  *See Buie*, 494 U.S. at 335 (holding officers may only perform a "cursory inspection of those spaces where a person may be found" while waiting to launch an attack).

Here, Deputy Casal testified that he "directed [officers] to certain places," (Casal Dep. at 25:1-3), and that he was the "primary officer" that night. (*Id.* at 8:4-6). Deputy Casal also testified:

> Q: [  ] My question is this: For the officers that you sent into each room, what did you tell them to do?
>
> A. To search.

(*Id.* at 29:5-7.) A reasonable jury presented with this evidence could find that Deputy Casal triggered, caused, or directed the broader protective sweep, which the Court has deemed unjustified as a matter of law based on the facts construed in the light most favorable to Plaintiffs. Accordingly, Defendant Casal's Motion is **DENIED** as to Plaintiffs' Fourth Amendment claim based potentially on Casal's directing others to perform an unlawful protective sweep.

## I.     Malicious prosecution of Mrs. Brand

Mrs. Brand claims the Deputies maliciously prosecuted her for the crimes she was charged with that night. For a Fourth Amendment malicious prosecution claim, "its elements and whether they are met ultimately are controlled by federal law." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1256 (11th Cir. 2010) (quoting *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003)). Under federal law:

> To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004); *Wood*, 323 F.3d at 881. As to the first prong, the constituent elements of the common law tort of malicious prosecution are: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff

> accused's favor; and (4) caused damage to the plaintiff accused."
> *Wood*, 323 F.3d at 882.

*Id.* Thus, to state a claim for malicious prosecution under § 1983, one must state a claim for malicious prosecution under state law.

The Court's analysis of the false arrest claims above applies here as well. As explained above, the denial of a motion for directed verdict in the underlying criminal trial bars a subsequent claim for false arrest or malicious prosecution. *See Remeneski*, 473 S.E.2d at 228; *Poole*, 2012 WL 1074291, at *7. And under Georgia common law, "when the court trying the criminal case determines that there is sufficient evidence for one of related criminal charges arising from the same transaction to go to the jury, that is sufficient to show that the existence of reasonable grounds for prosecuting other charges reasonably arising from the same transaction." *Remeneski*, 473 S.E.2d at 227. *See also Holmes v. Achor Ctr., Inc.*, 581 S.E.2d 390, 393 (Ga. Ct. App. 2003) (holding same). Thus, Defendants' Motion for Summary Judgment based on qualified immunity is **GRANTED** on Plaintiff's malicious prosecution claims. The Amended Complaint is somewhat unclear as to whether Mrs. Brand alleges federal or state law malicious prosecution claims (or both), but the above analysis applies equally to both. Thus, to the extent Plaintiff asserts state law malicious prosecution claims against the Deputies, summary judgment is also **GRANTED** as to those claims.

### J.    The Deputies' refusal to cover Mrs. Brand after the tasing

Mrs. Brand alleges that Defendants violated her constitutional rights by, after the tasing, refusing to cover her exposed breast and body despite numerous

requests from her and others.  Defendants, originally misconstruing the claim as a substantive due process claim, (*see* Doc. 60-4 at 43), contend that *Monroe v. Pape,* 365 U.S. 167 (1961), *overruled on other grounds*, *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), did not sufficiently put the Deputies on notice that the Fourth Amendment covers a ripped shirt claim.  (*See* Doc. 80 at 10; Doc. 79 at 14.)  Even if it did put the Deputies on notice, Defendants argue, it would not sufficiently put *these* Deputies on notice that they were required to replace the shirt of a woman "where the arrestee's shirt and brassiere covered her breasts." (Doc. 80 at 11.)

In the Court's prior order, when the evidence was viewed in the light most favorable to the Deputies, the Court denied summary judgment to Plaintiffs on this claim.  In that order, the Court accepted that the Deputies arranged Mrs. Brand's shirt sufficiently such that Mrs. Brand was not exposed.  On this motion, however, the facts are viewed in the light most favorable to Plaintiff and are materially different.

Plaintiffs argue that *Monroe v. Pape* clearly establishes that what Defendants did in this case was unlawful.  In *Monroe v. Pape*, the court found a constitutional violation where "thirteen Chicago police officers . . . broke through two doors of the Monroe apartment, woke the Monroe couple with flashlights, and forced them at gunpoint to leave their bed and stand naked in the center of the living room."  365 U.S. at 203 (Frankfurter, J., dissenting.)

Here, construing the evidence in the light most favorable to Mrs. Brand, a reasonable jury could find that that Mrs. Brand's ripped shirt left her partially naked in a constitutionally meaningful way.  A reasonable jury could find that Mrs. Brand's shirt was ripped such that the officers and others could not only "see through [Mrs. Brand's] bra, but because of the tear, individuals could see both [her] breasts."  (Tam. Brand Aff. ¶ 2.)  According to Wesley, Mrs. Brand's "left breast was out, totally out."  (Wesley Brand Dep. at 58:14-15.)  And according to Ms. Velazco, even though Mrs. Brand "had a bra on," (Velazco Dep. at 72:16), that did not mitigate the fact that her "breast was exposed."  (*Id.* at 71:18-19.)

Defendants argue that an exposed bra does not trigger constitutional protection.  Here, though, Mrs. Brand specifically testified that viewers could see through her bra, and the testimony of both Wesley and Ms. Velazco corroborates that at least one "breast" was exposed.  In addition, Mrs. Brand was tased and remained seated or prone in the foyer of her home for the duration of the events that night, and the front door was repeatedly opened by groups of officers entering the home.  According to Mrs. Brand, "[e]very officer that came in – they came two by two.  I said you don't belong in my house.  Can I have a shirt?" (Tam. Brand Dep. at 175.)  Each pair of officers responded, "Shut up," (*id.*), or a version of the phrase that included an expletive, and the officers laughed at her. (*Id.* at 174:14.)  And each time, Deputy Pardinas, who was standing with Mrs.

Brand, said "shut up" and twisted the handcuffs on Mrs. Brand's wrists so they dug into her skin.  (*Id.* at 174:11-175:19.)

Both Wesley and Mr. Brand also asked if Mrs. Brand could have a new shirt, and Mr. Brand even asked if he could give her the shirt off his back. (Wesley Brand Dep. at 59:5-7; Theo Brand Dep. at 194-195; Tam. Brand Dep. at 194:20-21, 195:2-11.)   Deputy Pardinas denied their requests.   (Wesley Brand Dep. at 59-60.)[39]  Deputy Casal also rejected Mr. Brand's repeated requests to get his wife a shirt or something else to cover her up.  (Theo Brand Dep. at 75:5-17.)

A reasonable jury could find that instead of just letting Mrs. Brand don a replacement shirt, the Deputies required her to expose at least one breast to the law enforcement officers entering her home — and anyone else she encountered on her way from her home to Deputy Pardinas's squad car, from the squad car into jail, and during at least some portion of the process of getting booked into jail.  (Tam. Brand Dep. at 205:10-14, 207:8-21; Tam Brand ¶ 23, Doc. 71.)  In one of her Statements Under Penalty of Perjury, Mrs. Brand testified:

> I was completely embarrassed when the male officer taking pictures of me [at the jail] for the mugshot told me to smile, I was going to be on the internet.  I was mortified.  A female officer was successful in keeping me covered up for the mugshot on her third attempt.

(Doc. 71 ¶ 23.)

---

[39] Viewing the facts in the light most favorable to Plaintiffs, Mr. Brand was escorted up the stairs by officers other than Defendants at least five different times to retrieve various things, but not once would they let him retrieve a shirt.  (Theo Brand Dep. at 195:9-17)  However, no evidence in the record permits a reasonable jury to infer liability for Deputy Pardinas or Deputy Casal causing any of the escorting officers' actions, *see Swint*, 51 F.3d at 999, so this evidence does not support Plaintiffs' claim.

The Eleventh Circuit recently recognized that an individual's constitutional right to bodily privacy has been clearly established in this circuit since 1996. *Mitchell v. Stewart*, 608 F. App'x 730, 734-35 (11th Cir. 2015). There, the court upheld the denial of summary judgment based on qualified immunity where a male and a female, wearing only tops that did not cover their genitals, were held at their home, transported to jail, and seen by others in jail, despite having asked for covering at least twice. *Id.* at 734. Relying on *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) and *Boxer X v. Harris*, 437 F.3d 1107 (11th Cir. 2006), the *Mitchell* Court held, "[t]hese two cases clearly establish the principle that, absent a legitimate reason, individuals maintain a right to bodily privacy, in particular the right not to have their genitals exposed to onlookers." *Id.* at 735. Thus, Mrs. Brand's right to bodily privacy was clearly established as of 2006.

Construing the evidence in the light most favorable to Mrs. Brand, a reasonable jury could conclude that Mrs. Brand's breasts, through her see-through bra, were exposed from the time Deputy Casal ripped her shirt to the time the officer at the jail covered her up. And the Deputies offered no legitimate reason for not covering Mrs. Brand (or allowing her to get another shirt) despite being asked numerous times by Mrs. Brand, Mr. Brand, and Wesley.[40] Based on

---

[40] That is unsurprising because, according to the Deputies' testimony, Mrs. Brand was sufficiently covered by her ripped shirt. While the Court accepted that version of the evidence in the Court's Order on Plaintiffs' Motion for Partial Summary Judgment, (Doc. 86 at 31-33), the Court now accepts Plaintiffs' quite different version for this opposing Motion. *See Reeves*, 530 U.S. at 150.

the evidence so construed, this was a clearly established violation of Mrs. Brand's right to bodily privacy for no legitimate reason. Accordingly, Defendants' Motion for Summary Judgment as to the ripped shirt claim is **DENIED**.

### K.   Remaining State Law Claims

Plaintiffs also allege violations of Georgia's parallel constitutional and statutory provisions. The Court has already addressed the false arrest and malicious prosecution claims in the above analyses. As to the remaining claims, Defendants make essentially four arguments:

1)   They are entitled to official immunity for all state law claims;

2)   The justification doctrine bars all tort claims;

3)   There is no state law equivalent of 42 U.S.C. § 1983, and even if there were, the Georgia Constitution's search and seizure provisions are no more protective than the Fourth Amendment of the U.S. Constitution; and

4)   The loss of consortium claim is barred because there is no such claim under federal law and because the state law claim must be based upon a viable personal injury, which is lacking here.

Plaintiffs respond that official immunity does not apply to Defendants' malicious behavior; the justification doctrine does not apply because Defendants did not raise it until now (and even if it did, it does not protect Defendants); the Georgia Constitution does provide a claim for these actions; and the loss of consortium

claims are appropriate as pled and need not be based upon a personal injury claim.

### 1.    *Official Immunity*

"Under Georgia law, county law enforcement officers are entitled to official immunity from suit and liability unless they 'negligently perform a ministerial act or act with actual malice or an intent to injure when performing a discretionary act.' *Roper v. Greenway*, 294 Ga. 112, 751 S.E.2d 351, 352 (2013); *see also* Ga. Const. art. I, § II, par. IX(d)." *Speight v. Griggs*, 579 F. App'x 757, 759 (11th Cir. 2014).   Plaintiffs argue that Defendants performed a discretionary act with malice.  A police officer loses the protection of official immunity if he acted with "actual malice or intent to injure." *Cameron v. Lang*, 549 S.E.2d 341, 345 (Ga. 2001).  "Actual malice" refers to "a deliberate intention to do wrong" which is more than simply "reckless disregard for the rights or safety of others." *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007) (quoting *Merrow v. Hawkins*, 467 S.E.2d 336 (Ga. 1996)).   A deliberate intention to do a wrongful act can be inferred from action taken where the officer knew the action was unjustified. *See City of Atlanta v. Shavers*, 756 S.E.2d 204, 207 (Ga. Ct. App. 2014), *cert. denied* (June 2, 2014); *see also Bateast v. DeKalb Cty.*, 572 S.E.2d 756, 758 (Ga. Ct. App. 2002); *Mitchell v. Stewart*, 26 F. Supp. 3d 1322, 1337 (M.D. Ga. 2014) *aff'd*, 608 F. App'x 730 (11th Cir. 2015).

The Georgia Supreme Court has held that the reasonableness of a search and seizure under the Georgia Constitution can be analyzed using the objective

standard applied in search and seizure cases under the Fourth Amendment of the federal Constitution. *City of East Point v. Smith*, 365 S.E.2d 432, 434 (Ga. 1988). Thus, as the Court already stated that a reasonable jury could find facts supporting the conclusion that Deputy Pardinas's (1) entry into the front door and (2) limited protective sweep were objectively reasonable under the Fourth Amendment, Deputy Pardinas is likewise entitled to official immunity for alleged violations of the Georgia Constitution as to those acts.

Where there is a dispute of material fact about whether a search or seizure is *objectively* reasonable under the Fourth Amendment, however, courts still undertake the *subjective* malice or intent to injure inquiry in order to determine the officer's official immunity with regard to related Georgia Constitution- and state law-based claims. *See Porter v. Massarelli*, 692 S.E.2d 722, 726 (Ga. Ct. App. 2010) (denying qualified immunity because disputes of material fact precluded a finding that the officer's action were reasonable, and then undertaking the subjective inquiry for related state law claims and finding evidence of intent to cause harm). The Court therefore undertakes the subjective inquiry for the Georgia constitutional[41] and state law claims for which qualified immunity was denied: Deputy Casal's entry through the front door, Deputy Casal's direction of the protective sweep, and Deputy Pardinas's tasing. All of

---

[41] *Porter v. Massarelli* also stands for the proposition that officers who violate both the U.S. Constitution and the Georgia Constitution may be liable in tort under both instruments. *See Porter*, 692 S.E.2d at 726 (finding factual dispute precluded summary judgment on the plaintiff's tort claims of excessive force and other violations of the U.S. Constitution, the Georgia Constitution, and Georgia state law).

these claims arise[42] under the same provision of the Georgia Constitution: Article I, Section I, Paragraph XIII.  "[T]he protection against unreasonable searches provided in [this paragraph of] the Georgia Constitution is the same as that provided by the United States Constitution." *Wells v. State*, 348 S.E.2d 681, 683 (Ga. Ct. App. 1986).  *See also Elder v. Camp*, 18 S.E.2d 622, 625 (Ga. 1942).

Under Plaintiffs' version of the facts, a reasonable jury could find that Deputy Casal acted with the intent to injure Plaintiffs' constitutional rights when he put his foot in the doorjamb upon Mrs. Brand opening the front door.  Above, the Court explained that a reasonable jury could find Deputy Casal had no reason to believe that Wesley lived at the residence or that he was at home at the time, and therefore no right to enter the home.  A jury could therefore find that Defendant Casal intended to enter the Brands' home knowing he lacked the prerequisites for doing so (a deliberate intention to do wrong), constituting a violation of Article 1, Section 1, Paragraph XIII of the Georgia Constitution.  Such a finding would constitute malice, thereby depriving Defendant Casal of official immunity.  Deputy Casal's Motion for Summary Judgment as to this claim is therefore **DENIED**.

A reasonable jury could also conclude that Deputy Casal had no reason to direct a broad protective sweep.  Under Plaintiffs' version of the facts, a jury could find that Deputy Casal was the initial aggressor that night, and Deputy

---

[42] Though the Second Amended Complaint is less than clear, Plaintiffs appear to bring battery and loss of consortium claims against Defendants.  (*See* Compl. ¶¶ 44-45; 54-56.)  Summary judgment on these claims has been briefed and therefore is appropriately addressed herein.

Pardinas was the only other person to undertake an aggressive, violent act when she tased Mrs. Brand.   Based on Plaintiffs's evidence, then, no specific, articulable facts warranted the suspicion that a dangerous individual lurked somewhere within the home, yet Deputy Casal nonetheless directed others to conduct a search of the home.   A reasonable jury could conclude, therefore, that Deputy Casal directed other officers to search the Brands' home intentionally and without justification.   *See Shavers*, 756 S.E.2d at 207.   Accordingly, Deputy Casal's Motion is **DENIED** as to this claim.

Mrs. Brand also asserts a Georgia-constitution-based excessive force claim and a state law battery claim[43] against Deputy Pardinas for the tasing.   The evidence, taken in the light most favorable to Mrs. Brand, establishes that Deputy Pardinas tased Mrs. Brand for failing to drop the phone after Mrs. Brand had told Deputy Pardinas that she was calling 911 because Deputy Casal had assaulted her. This evidence is sufficient for a jury to determine that Deputy Pardinas may have acted with actual malice and intent to injure.   *See Tabb v. Veazey*, No. 1:05-cv-1642, 2007 WL 951763, at *7-8 (N.D. Ga. Mar. 28, 2007) (finding evidence of actual malice where officer hit plaintiff on the face with butt of a handgun when plaintiff was no longer resisting); *Hill v. Mull*, No. 5:04-CV-329, 2006 WL 3022280, at *14 (M.D. Ga. Oct. 23, 2006) (finding issue of material fact existed

---

[43] "A cause of action for battery will lie for any unlawful touching, that is, a touching of the plaintiff's person, even if minimal, which is offensive. An offensive touching is one which proceeds from anger, rudeness, or lust." *Lawson v. Bloodsworth*, 722 S.E.2d 358, 359 (Ga. Ct. App. 2012) (quoting *Ellison v. Burger King Corp.*, 670 S.E.2d 469 (Ga. Ct. App. 2008)). Defendants do not argue that the elements of civil battery have not been met, and a reasonable jury could find that they have been.

as to actual malice where officer charged plaintiff like a football player, threw plaintiff to the ground while handcuffed, kneed plaintiff in the back, and watched as another officer stood on plaintiff's feet); *Reed v. City of Lavonia*, 390 F. Supp. 2d 1347, 1369-70 (M.D. Ga. 2005) (finding issue of fact as to actual malice where officer attacked plaintiff with a baton despite plaintiff's lack of resistance and continued to beat plaintiff when he was on the ground); *Jackson v. City of Albany, Ga.*, 49 F. Supp. 2d 1374, 1381 (M.D. Ga. 1998) (finding issue of material fact existed where officer began hitting plaintiff with his nightstick after plaintiff was subdued).  As a dispute of material fact exists as to whether Deputy Pardinas acted with actual malice, she is not entitled to official immunity from Mrs. Brand's excessive force or battery claims and her Motion is **DENIED** on this ground.

### 2.    *Justification Doctrine*

Defendants contend Plaintiffs' state law claims are barred by the "Justification Doctrine," codified at O.C.G.A. § 51-1-13, which states, "[a] physical injury done to another shall give a right of action to the injured party, whatever may be the intention of the person causing the injury, unless he is justified under some rule of law."  Defendants claim four Georgia statutory provisions justify all of the acts underlying Plaintiffs' state law claims:  O.C.G.A. §§ 17-4-3, 17-4-20(b), 17-5-27, and 17-5-28.  The Court need only consider whether these statutes apply

as a bar to Plaintiffs' three remaining state law claims: Deputy Casal's entry, Deputy Casal's direction of the protective sweep, and Deputy Pardinas's tasing.[44]

O.C.G.A. § 17-4-3 (1933) reads, "In order to arrest under a warrant charging a crime, the officer may break open the door of any house where the offender is concealed."  To avoid obvious constitutional issues, Georgia courts have construed this provision in two ways.  Some courts treat it as a codification of the *Payton* test, *i.e.*, an officer can break open the door *if* he reasonably believes the wanted individual resides there and is there at the time.  *See Brown v. State*, 523 S.E.2d 333, 335 (Ga. Ct. App. 1999) ("Even if this statute has been limited by *Steagald*, the arrest warrant gave the officers authority to enter Brown's own premises to arrest him."); *Nash v. Douglas Cty.*, 733 F. Supp. 100, 105 (N.D. Ga. 1989).  Other courts treat it as a codification of the exigent circumstances doctrine.  *See Anderson v. State*, 287 S.E.2d 195 (Ga. 1982); *Green v. State*, 283 S.E.2d 19, 21 (Ga. Ct. App. 1981).  The Court has already explained how, based on the evidence as construed in this motion, Deputy Casal is not entitled to rely on *Payton*.  Furthermore, at the time he first stuck his foot in the doorjamb, no reasonable jury could find he was confronted with exigent circumstances.

O.C.G.A. § 17-4-20(b) (2006) does not apply to Deputy Pardinas's use of force because as stated in its final sentence, "Nothing in this Code section shall be

---

[44] Plaintiffs' assertion that Defendants cannot raise the Justification Doctrine as a defense because they did not do so earlier in this lawsuit is without merit.  The sole case Plaintiffs cited for that proposition says nothing of that sort.  *See Schlumberger Technology Corp. v. Coil Tubing Solution, LLC*, 2015 WL 1737262 (S.D. Tex. 2015).

construed so as to restrict such sheriffs or peace officers from the use of such reasonable nondeadly force as may be necessary to apprehend and arrest a suspected felon or misdemeanant." The operative word in that sentence is "reasonable." That provision cannot be used to justify Deputy Pardinas's use of force that the Court has already determined could be found to be unreasonable by a jury.

Finally, neither O.C.G.A. §§ 17-4-20(b) (1966)[45] nor 17-5-28 (1966)[46] justify the Deputies' actions, as both of those provisions relate to the execution of a search warrant. Accordingly, Defendants' Justification Doctrine defense is unavailing and their Motion on that ground is **DENIED**.

### 3. *Loss of Consortium*

Finally, as some of Plaintiffs claims have survived summary judgment, the Court turns to each Plaintiffs' respective loss of consortium claim. Plaintiffs were married at the time of the incident. In Georgia, "[i]f one spouse is tortiously injured by a third person, the other spouse may have a cause of action against that person for injury to the consortium; that is, injury for loss of the injured spouse's services." Charles R. Adams III, Ga. Law of Torts § 30:3 (2015) (citations omitted). "Under Georgia law, a claim for loss of consortium by one spouse is derivative and dependent upon the existence of some viable claim by the other spouse." *Goodman v. Kimbrough*, 718 F.3d 1325, 1336 (11th Cir. 2013)

---

[45] Section 17-5-27 reads, in pertinent part, "All necessary and reasonable force may be used to effect an entry into any building or property or part thereof to execute a search warrant."
[46] Section 17-5-28 reads, in pertinent part, "In the execution of the search warrant the officer executing the same may reasonably detain or search any person in the place at the time."

(citing *Henderson v. Hercules, Inc.*, 324 S.E.2d 453, 454 (Ga. 1985) and *Sevcech v. Ingles Mkts., Inc.*, 474 S.E.2d 4, 9 (Ga. Ct. App. 1996)).  Even so, it is still "a 'separate' and 'distinct' claim of another person." *Stapleton v. Palmore*, 297 S.E.2d 270, 272 (Ga. 1982).  Where summary judgment is granted against a plaintiff on the underlying tort claim, the plaintiff's partner's loss of consortium claim will not lie. *See Goodman*, 718 F.3d at 1336.

Above, summary judgment was denied as to the tasing of Mrs. Brand and the search of her home, affording Mr. Brand the possibility of a loss of consortium claim.  A loss of consortium "plaintiff must introduce evidence sufficient to pass muster on two fronts, these being (1) liability and (2) damages." *Smith v. Tri-State Culvert Mfg. Co.*, 191 S.E.2d 92, 94 (Ga. Ct. App. 1972).  As to liability, "Georgia courts would reject [the Deputies'] argument that a § 1983 claim cannot provide the first element of a loss of consortium claim; this Court must do likewise." *Pattee v. Ga. Ports Auth.*, 477 F. Supp. 2d 1272, 1278 (S.D. Ga. 2007); *see also Harris v. Augusta, Ga.*, No. CV 106-202, 2010 WL 1286205, at *5 (S.D. Ga. Mar. 31, 2010).  At any rate, Mrs. Brand's state law battery claim also survived summary judgment.  Mr. Brand has viable claims against both Deputies because the Court has denied summary judgment to both Defendants on claims brought by Mrs. Brand.

Mr. Brand has also provided evidence of loss of "society, companionship, love, affection, aid, services, cooperation, sexual relations, and comfort, such being special rights and duties growing out of the marriage covenants." *Smith*,

191 S.E.2d at 94.  Mrs. Brand testified to the many ways in which she has become emotionally detached from Mr. Brand, and Mr. Brand testified to much of the same.  (Theo Brand Dep. at 104:17-22, 109.)  Summary judgment is therefore **DENIED** as to Mr. Brand's claim for loss of consortium.

Summary judgment was also denied on Mr. Brand's claims that Deputy Casal's entry into the home and his security sweep, affording Mrs. Brand the possibility of a claim.  Defendants argue that a loss of consortium claim cannot be based on Mr. Brand's "trespass-type claims (rather than for personal injury)." (Doc. 60-4 at 49.)  Plaintiffs respond both that they do not agree with the distinction Defendants propose, and, at any rate, the Fourth Amendment claims raised by Theo Brand are personal injuries.  *Compare Silverman v. United States*, 365 U.S. 505, 511 (1961) ("Inherent Fourth Amendment rights are not inevitably measurable in terms of ancient niceties of tort and real property law.  . . . The Fourth Amendment, and the personal rights which it secures, have a long history.") *with United States v. Jones*, 132 S. Ct. 945, 949 (2012) (Scalia, J.) ("The text of the Fourth Amendment reflects its close connection to property").

The only authority cited for Defendants' proposed personal/property injury distinction is *Walden v. Coleman*, 124 S.E.2d 313 (1962).  That case involves the death of a husband 2.25 hours after a car crash, and the sole question before the court was whether the wife could assert a claim for loss of consortium during those 2.25 hours (before "all rights are merged in the death action").  *Id.* at 314. The court held she could, but it said nothing about the type of tort required for a

loss of consortium claim.   And neither of the statutes that supply a loss of consortium cause of action — O.C.G.A. §§ 51-1-9 and 51-1-10 — contain a textual limitation on the type of tort, either.   Accordingly, the Court will make no such distinction.   For the same reasons described in the analysis of Mr. Brand's loss of consortium claim, a reasonable jury could find[47] that Mrs. Brand has sufficiently supported both the liability and damages portions of her claim, too, so summary judgment is therefore **DENIED**.

## IV.   CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment [Doc. 60] is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) **GRANTED** as to all claims against Deputy Pardinas **except:**

(a) The excessive force claim under the U.S. and Georgia Constitutions;

(b) The refusal to replace the shirt claim under the U.S. and Georgia Constitutions;

(c) The state law battery claim; and

(d) The state law loss of consortium claim.

(2) **GRANTED** as to all claims against Deputy Casal **except**:

(a) The unlawful entry claim under the U.S. and Georgia Constitutions;

---

[47] The Court only addresses Defendants' arguments that "federal law cannot provide the underlying act" and "trespass-type claims don't count" as bases for their defense because these two grounds are the only ones raised in Defendants' Motion.  The Court notes that, once at trial, Mrs. Brand will have to present sufficient evidence of *her* loss that resulted specifically from the violation of *Mr. Brand's* rights and the alleged injuries he thereby suffered.  The Court notes that loss of consortium claims can be intrusive to the marital relationship and individual privacy and should be approached carefully.  There are potentially also double-recovery/merger-of-rights issues here that would have to be sorted out at trial.

(b) The protective sweep claim under the U.S. and Georgia Constitutions;

(c) The refusal to replace the shirt claim under the U.S. and Georgia Constitutions; and

(d) The state law loss of consortium claim.

This matter is **REFERRED** to the next available Magistrate Judge for mediation.  Mediation **SHALL** conclude no later than February 9, 2016, and the matter is **ADMINISTRATIVELY CLOSED** pending the conclusion of mediation.[48]   In the event the mediation is successful, the parties are **DIRECTED** to submit a joint status update within 5 days of the conclusion of mediation.  If the mediation is unsuccessful, the parties are **DIRECTED** to submit a pre-trial order within 15 days of the conclusion of mediation.  The Clerk is **DIRECTED** to resubmit this matter to the undersigned 70 days from the date of this Order.  This matter is **SET** for the trial calendar to begin May 9, 2016 at 9:30 AM in Courtroom 2308.

**IT IS SO ORDERED** this 21st day of December, 2015.

_____
**Amy Totenberg**
**United States District Judge**

---

[48] Administrative closure of a case does not prejudice the rights of the parties to litigation in any manner.  The parties may move to re-open an administratively closed case at any time.